IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON – YAKIMA

| | |
|---|---|
| TAHVIO GRATTON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC., a Delaware Corporation,<br><br>Defendant. | No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL REQUESTED** |

COMPLAINT FOR DAMAGES
Page i

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

## I. NATURE OF THE ACTION

1. This is an action for damages for declaratory judgment, equitable relief, and monetary damages, instituted to secure the protection of and to redress the deprivation of rights secured through the Washington Law Against Discrimination, RCW 49.60 et al. ("WLAD"), 42 U.S.C. § 1981 ("Section 1981"), and Washington's Tort of Wrongful Discharge in Violation of Public Policy.

2. Plaintiff Tahvio Gratton ("Plaintiff" or "Mr. Gratton") is a former employee of Defendant United Parcel Service ("UPS"). During his employment, Mr. Gratton, a black man, was discriminated against and subjected to a hostile work environment based on his race and in retaliation for engaging in protected activity under Washington and Federal law. Mr. Gratton was discriminatorily and retaliatorily denied job opportunities and assignments because of his race and protected activity. Ultimately, he was unlawfully terminated by Defendant UPS in violation of the WLAD, Section 1981, and Washington common law. Plaintiff seeks monetary relief, including pecuniary and non-pecuniary damages, compensatory damages, and punitive damages to the fullest extent allowed by law.

## II. PARTIES, JURISDICTION, AND VENUE

3. Plaintiff Tahvio Gratton is a former employee of Defendant. Plaintiff is a resident of Yakima, Washington.

4. Defendant UPS Delaware Corporation that transacts business in the Eastern District of Washington.

5. The Court has federal question jurisdiction under 28 U.S.C § 1331 for claims brought under 42 U.S.C. § 1981.

COMPLAINT FOR DAMAGES
Page 1

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

6. This Court has supplemental jurisdiction over Plaintiff's Washington law claims under 28 U.S.C. §1367.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's allegations occurred in the Eastern District of Washington, the subject employer is located in this District, and Defendant resides and/or does business in this District.

8. At all relevant times, Defendant employed Plaintiff in the Eastern District of Washington. Defendant employs the requisite number of employees under the aforementioned statutes.

### III. FACTUAL ALLEGATIONS

9. Plaintiff reincorporates paragraphs 1 through 8.

10. Plaintiff, Tahvio Gratton was employed by Defendant UPS as a Cover Driver and Delivery Driver from September 26, 2016 until his unlawful termination on October 19, 2021.

11. In or around January 2018, Mr. Gratton transferred from Seattle UPS center to the Yakima UPS center.

12. At the time that he transferred to UPS Yakima, Plaintiff had about one-and-a-half years of experience working as a Cover Driver.

13. Plaintiff Gratton is African American.

14. Immediately after beginning his work as a full-time Cover Driver in Yakima, UPS Managers treated Mr. Gratton differently from his white peers.

15. On-Road Supervisor Matt Fromherz was short with him, ignored him, and spoke down to him, while being noticeably friendly towards white Drivers.

COMPLAINT FOR DAMAGES
Page 2

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

16. Supervisor Fromherz, along with Center Manager Erik Loomis, was in charge of scheduling drivers and assigning routes. He gave Mr. Gratton less opportunity to work than the other Cover Drivers.

17. Plaintiff Gratton would arrive at the UPS Center on a daily basis to learn that he was "laid-off" for the day.

18. In order of seniority, Drivers are "laid off" when there is not enough work for them to perform, such that the lowest ranking Drivers will be denied work and compensation during periods of shortage.

19. Often Mr. Gratton was the only Cover Driver who was laid off. It soon became apparent that the Center Managers were singling out Mr. Gratton and laying him off intentionally, even when there were work opportunities for him.

20. In February 2018, when another Driver specifically asked Mr. Gratton to cover his route, On-Road Supervisor Fromherz quickly interjected, "No, not today." Fromherz provided no reason for refusing to allow Mr. Gratton to cover the route that day.

21. On or around February 26, 2018 Mr. Gratton met with On-Road Supervisor Fromherz and asked him why he had not been allowed to cover the route. Fromherz responded: "Because you didn't come and ask me like a man."

22. Mr. Gratton opposed such treatment. He told Mr. Fromherz, "That is belittling and attacking of my character."

23. Mr. Gratton reported this treatment, including being denied the driving route, to Center Manager Erik Loomis, who did not seem concerned and gave no true response.

24. UPS was not compensating Mr. Gratton for forced lay-off, as required under the union rules. Plaintiff Gratton also learned that even Part-Time

COMPLAINT FOR DAMAGES
Page 3

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

Cover Drivers were being given preference over him, in violation of the union rules regarding seniority.

25.  On April 19, 2018, Mr. Gratton filed a complaint regarding UPS laying him off without proper compensation.

26.  As a result of Mr. Gratton's complaint, the Center Managers were required to post a list revealing which drivers were working which routes each day.

27.  The list revealed that Plaintiff Gratton was the only driver who was actually not being allowed to work, and that the other drivers listed for lay off still got work.

28.  Mr. Gratton's complaints regarding racial harassment, discrimination and retaliation, resulted in further, ongoing retaliation.

29.  In Mr. Gratton's presence, On-Road Supervisor Matt Fromherz told other drivers that Mr. Gratton was the reason the list was up and that, "Now, you guys will be getting less days off," creating frustration by other drivers towards Mr. Gratton.

30.  On or about April 24, 2018, the Center Managers assigned Plaintiff Gratton a "ride along," in which a manager accompanies and observes a driver en route. Manager Sam O-Rourke, who rode along with Mr. Gratton, subjected him to racial harassment throughout the day by repeatedly referring to him as "Boy," among other disparaging remarks.

31.  Supervisor O'Rourke spent the day watching Mr. Gratton work, barking orders at him, and demeaning him based on his race.

32.  Mr. O'Rourke is white and younger than Mr. Gratton. Rather than referring to Mr. Gratton by name, he referred to him as "Boy" throughout the

COMPLAINT FOR DAMAGES  
Page 4

SHISHIDO TAREN GOLDSWORTHY  
705 Second Avenue, Suite 1500  
Seattle, WA 98104  
(206)622-1604

day. For example, he said to Mr. Gratton, "Is this the hardest you've ever worked, Boy?" "Move faster, Boy, let's go!" "Boy, I told you to hurry!"

33. Mr. O'Rourke also made offensive sports references, saying to Mr. Gratton, "Boy, why would I play you when I have a star running back?"

34. When Mr. Gratton ran across the street to drop off a package, O'Rourke said, "There we go, Boy, that's what I like to see!"

35. Early during the ride-along, Mr. Gratton openly opposed Mr. O'Rourke's racial harassment. He asked Mr. O'Rourke, "Why are you calling Boy? I'm not your Boy." Mr. O'Rourke said, "I'm from the South. That's how I talk." Mr. Gratton responded, "No black man in the South would be okay with you talking to him that way and I am not okay with it, so stop calling me that."

36. Despite Mr. Gratton's open and direct opposition to such treatment, Mr. O'Rourke continued to call him "Boy" throughout the day and speak to him in a demeaning tone, even in front of customers.

37. A Footlocker employee witnessed some of Mr. O'Rourke's conduct towards Tahvio Gratton that day, which she described as "shocking":

> It was about 10:00 AM or 11:00 AM when Tahvio came by, rang the bell and said "Hey. How's it going? Like he normally did when he began his delivery. The other man also cam inside the store and started talking to Tahvio in a very condescending tone.
>
> When Tahvio greeted me and asked how I was doing, the other man said, "Let's get going, boy, let's move." "I didn't tell you to talk, boy." He went on to call Tahvio "Boy" over and over again, while barking orders at him. Every time this man talked to Tavhio while in the Foot Locker store that day, he call him "boy." I was absolutely shocked.
>
> . . .
>
> There was no reason for this supervisor to be critical of Tahvio's pace of work that day. Tahvio was very quickly bringing in full dollies of

COMPLAINT FOR DAMAGES
Page 5

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

> boxes, as well as carrying some of the smaller boxes three at a time by hand. He finished the box delivery very quickly, as he always did. There was also absolutely no reason to keep referring to Tahvio as "boy." I felt certain that this supervisor was talking to Tahvio this way because he is black.
>
> . . .
>
> At the end of Tahvio's delivery that day, I was double-counting all of the boxes as I always did before singing off. During that moment of downtime, Tahvio and I again exchanged a few words. His supervisor barked, "I told you, boy, you're not supposed to talk!"
>
> At this point, I really couldn't take anymore how condescending and offensive this supervisor was towards Tahvio. As the supervisor was signing the delivery paperwork, I told him, "I hope you don't get your boots too dirty or work too hard." He responded, "Oh trust me, I won't. I got this boy working."

38. Upon returning to the Yakima UPS Center that day, Mr. Gratton went directly to Center Manager Erik Loomis's office and informed him of Mr. O'Rourke's conduct.

39. After reporting what occurred, Mr. Gratton told Center Manager Loomis, "I'm not going on ride-alongs with your managers if they are going to be racist. Sam [O'Rourke] was calling me 'Boy' the whole time."

40. Mr. Loomis responded dismissively, "That's just how he talks," then turned away.

41. These events caused Plaintiff Tahvio Gratton severe humiliation and distress. He broke down crying in his car before driving home that day.

42. UPS subjected Mr. Gratton to ongoing retaliation, including open displays of hostility.

43. On or about May 25, 2018, Mr. Gratton came to the UPS Center on a day off in order to pick up a personal package. On-Road Supervisor Fromherz stopped Mr. Gratton and asked, "Are you working today?" When Mr. Gratton

COMPLAINT FOR DAMAGES  
Page 6

SHISHIDO TAREN GOLDSWORTHY  
705 Second Avenue, Suite 1500  
Seattle, WA 98104  
(206)622-1604

said "No," Fromherz yelled, "Then get the fuck off the property!" Mr. Gratton was shocked and asked, "What did you just say?" Fromherz repeated, "Get the fuck off the property."

44. Mr. Gratton had never seen Fromherz treat another employee that way.

45. Retaliation by the Center Managers continued. Mr. Gratton was laid off even more than before. Supervisor O'Rourke now refused to acknowledge or speak to Mr. Gratton.

46. In June 2018, Mr. Gratton filed a complaint regarding the racial harassment by Supervisor O'Rourke and for Supervisor Fromherz yelling at him.

47. Mr. Gratton also filed another written complaint on June 21, 2018 for being denied the chance to work when it was evident that there was work he could perform. At that time, the Center Managers were delivering driver misloads themselves, while putting Mr. Gratton on forced layoff. This again violated Mr. Gratton's eight-hour work guarantee under the union rules.

48. Throughout his employment, Defendant assigned Mr. Gratton to a worse schedule and driving routes than his white colleagues.

49. Specifically, he was assigned to the "mall route," which a witness describes as follows:

> We consider it the 'bulkiest' route. It usually requires more than one truck, and the route is hard to get done quickly, especially on days when it has a heavier pick-up volume. Other business routes and residential routes are faster and require less bulky boxes. Nobody likes the mall route and it's the only one they would let Tahvio do.

50. Center Manager Erik Loomis discriminatorily tried to prevent Mr. Gratton from winning a bid on the mall route, so that it could be exclusively assigned to him. A witness states:

COMPLAINT FOR DAMAGES
Page 7

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

> Management became aware that Tavhio was going to bid for the route so that he could work consistently. At that point, Erik Loomis asked Brandon Ward, who was a white driver with more seniority than Tahvio, to bid for the mall route. I was working with Brandon Ward . . . and he specifically told me about this conversation with management. He said that management asked him to bid on the mall route because they knew that Tahvio was going to bid for it. Brandon Ward told me that management said they didn't want to have to give Tahvio work and wanted to keep him laid off. Brandon said he refused to bid on it because it's not a good route.

51.     After Mr. Gratton succeeded in obtaining the undesirable mall route, so that he could finally work consistently, Center Manager Loomis and Supervisor Fromherz purposefully made his route longer and began criticizing him for taking too long. A witness states:

> Tahvio had to fight to get the mall route. When he was finally successful, Erik Loomis and Matt Fromherz started making his route longer so that he was out until late in the evening, finishing all of his stops. They also added out-of-the way stops to the mall route to make it harder for him. . . I saw it every day.

52.     Center Manager Erik Loomis and On-Road Supervisor Matt Fromherz openly expressed their disdain for Mr. Gratton. After he opposed their discriminatory refusal to assign work to him, they retaliatorily decided to over-work him. This was no secret. A witness states:

> I specifically remember a conversation between Matt [Fromherz] and Eric [Loomis] in the Spring or Summer of 2018, when I was present with them in the main office. Matt said, "I'll do anything to not work Tahvio." Eric nodded and agreed. At the time of that conversation, Tahvio had just recently filed a grievance about Matt Fromherz and Eric Loomis not putting him on the schedule. After this grievance, Matt and Eric had to start posting the schedules each day so that the drivers could see who was being worked. Posting the schedule put Matt and Eric's scheduling choices out in the open, and did force

COMPLAINT FOR DAMAGES  
Page 8

SHISHIDO TAREN GOLDSWORTHY  
705 Second Avenue, Suite 1500  
Seattle, WA 98104  
(206)622-1604

> them to work Tahvio more, but they still tried to set him up for failure.
>
> When Matt and Eric did feel forced to work Tahvio, they tried to find ways to criticize him or make false complaints about him. I was present and witnessed them saying things like, "Let's pile the work on him. If we're going to work him, let's make him *work*." For example, they would take opportunities to make his pickup load much heavier than that of other drivers. Then they would unfairly criticize Tahvio for "taking too long," even though he took less time than other drivers on the same route, while delivering a much heavier load.
>
> . . .
>
> I have been in a position to see Tahvio's performance. He is an excellent employee. He is hardworking, polite on-time, and eager to do his job. He always has a great attitude and is friendly and positive, even when being treated unfairly. I could tell that Tahvio took a lot of pride in being a stand-up employee and doing his job well. It made me sad to see him being treated unfairly, to where he was having to file grievances and raise complaints, just to get put onto the schedule at all. I never saw a white driver having to do this.

53.     The Center Managers went out of their way to retaliate against Mr. Gratton. Where he had previously been denied work, they now made his route harder and required him to regularly deliver the other drivers' misloads, keeping him out late into the night.

54.     Mr. Gratton began having to file complaints for being over-loaded and over-worked.

55.      The Center Managers continued to discriminatorily and retaliatorily single out Mr. Gratton and accuse him of performance issues. He would also have to file further complaints about these matters.

56.     Center Manager Erik Loomis treated Mr. Gratton with open disdain in front of the other drivers, singling him out for small, common issues and publicly shaming him.

COMPLAINT FOR DAMAGES
Page 9

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

57. Mr. Gratton was also repeatedly called on the loudspeaker in front of his peers to come into the manager's office for discriminatory scrutiny.

58. For example, Mr. Gratton was reprimanded for having visible tattoos, while many white drivers also had visible tattoos and were not called into the office.

59. Mr. Gratton was even called into the office for wearing a sweater, while other white drivers wore sweaters without issues.

60. Mr. Gratton was not the only black employee who was subjected to such discrimination by Defendant. Other black drivers, particularly those who management associated with Mr. Gratton, suffered similar discrimination and harassment.

61. For example, Center Manager Loomis attempted to force a black driver, Travis Anderson, to cut his hair after he made a complaint that he was not being paid correctly. Mr. Anderson had been wearing long throughout his employment with UPS and other white drivers were allowed to have long hair.

62. As he did with Plaintiff Gratton, Center Manager Loomis also reprimanded Mr. Anderson for having visible tattoos, while white drivers were allowed to display theirs.

63. Center Manager Loomis made another black driver, Xavier Briggs, "scratch" (successfully run a route within a certain amount of time) five times in order to pass a probationary period, when no other white drivers were required to do so.

64. White drivers received superior routes and workloads compared to black drivers and, like Mr. Gratton, other black drivers were criticized for "taking too long" on their overloaded routes.

COMPLAINT FOR DAMAGES
Page 10

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

65. White employee-drivers were also given preferential treatment by being allowed to ask Defendant's management to take stops off their route in order to improve their route times. Black drivers, including Mr. Gratton, were not permitted to remove stops and instead would be criticized for being "slow" and taking too long to complete routes.

66. When black divers finished their routes, they were required to go back out and help the white drivers finish theirs, as well as deliver "misloads." Misloads occur when a package is placed in the wrong delivery vehicle. White drivers were seldom asked to do the same for black drivers.

67. Like Mr. Gratton, other black drivers were often paid incorrectly.

68. Mr. Gratton stood up for himself, as well as other black drivers who were having similar experiences. He assisted the other black drivers in filing complaints and advocated for fair treatment of all black drivers.

69. On June 11, 2020, Mr. Gratton filed a written complaint about being singled out and scrutinized for something that white employees were not. In his complaint, he stated: "This has been a noticeable issue with Erik Loomis on his overly negative and prejudiced choice of discipline towards his Black employees."

70. Plaintiff Gratton's opposition to discriminatory treatment continued throughout his employment and drew further hostility and retaliation by the Center Managers. It was no secret that they wanted to fire him.

71. Indeed, a witness reports that Center Manager Loomis approached him in his truck and warned him that if he associated with Mr. Gratton, "it's going to cause you a lot of problems in your UPS career."

COMPLAINT FOR DAMAGES
Page 11

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

72. Loomis then asked this witness if he had seen anything that Plaintiff Gratton might be doing wrong. Center Manager Loomis was retaliatorily fishing for information that could be used against Mr. Gratton.

73. These are just examples of how Mr. Gratton and other black employees were discriminated against and retaliated against during their employment with Defendant UPS.

74. Defendant targeted Mr. Gratton because of his race and protected activity and repeatedly tried to concoct false reasons to terminate his employment.

75. Indeed, witnesses heard supervisors make comments like "I wish we could just get rid of Tahvio [Mr. Gratton]" and "I'll do whatever it takes to not work him."

76. Ultimately, Defendant unlawfully terminated Mr. Gratton's employment on or about October 19, 2021.

77. The supposed justifications Defendant gave for Mr. Gratton's termination are false and are pretextual.

78. Defendant unlawfully terminated Mr. Gratton because of his race and because of his protected activity.

79. Defendant engaged in unlawful employment practices against Plaintiff during his employment, in violation of, 42 U.S.C. § 1981, *et seq.* ("Section 1981"); RCW 49.60, *et seq.* ("WLAD"); and in retaliation for engaging in protected activity under these statutes.

80. Defendant unlawfully terminated Plaintiff in violation of Washington public policy.

81. Washington has declared that "practices of discrimination against any of its inhabitants because of race, creed, color, national origin, citizenship or

COMPLAINT FOR DAMAGES
Page 12

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

immigration status, families with children, sex, marital status, sexual orientation, age, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010.

82. Washington has a public policy of ensuring that all employee are properly paid wages owed.

83. Defendant failed to act to eliminate the discrimination and retaliation Mr. Gratton was subjected to during his employment.

84. The effect of the practices complained of in the above paragraphs has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race and opposition to Defendant's unlawful activities.

85. The unlawful employment practices complained of in the above paragraphs were intentional.

86. The unlawful employment practices complained of in the above paragraphs were done with malice or reckless indifference to Plaintiff's rights as protected by federal and state laws.

87. Other black drivers, particularly those who the managers associated with Mr. Gratton, were similarly singled out for supposed minor policy violations.

### IV.    RESERVATION OF RIGHTS

COMPLAINT FOR DAMAGES
Page 13

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

Case 1:22-cv-03149-TOR    ECF No. 1    filed 10/18/22    PageID.15    Page 15 of 16

Plaintiff reserves the right to add, revise, or withdraw any claims, or add additional parties during the course of the litigation as information is obtained through litigation.

## V. PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A. Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for all employees, and which eradicate the effects of its past and present unlawful employment practices.

B. Order Defendant to make Plaintiff whole by providing appropriate back pay and front pay in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

C. Order Defendant to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in the above paragraphs, including out-of-pocket expenses, in an amount to be determined at trial.

D. Order Defendant to make Plaintiff whole for the wrongful withholding of wages by providing relief under RCW 49.48 *et seq.* and RCW 49.52 *et seq.* or any other applicable statute, including awarding double damages.

E. Order Defendant to make Plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from the acts complained of in the above paragraphs, including without limitation, emotional pain, suffering, and loss of enjoyment of life, in an amount to be determined at trial.

F. Order Defendant to pay Plaintiff punitive damages for the conduct described in the above paragraphs, in amounts to be determined at trial, to the fullest extent allowed by law.

COMPLAINT FOR DAMAGES
Page 14

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604

  G. Order Defendant to pay Plaintiff for any and all tax consequences associated with the damages and cost award, including but not limited to attorney's fees.

  H. Award Plaintiff the costs of this action, including attorney's fees, expert fees, and all other costs to the fullest extent allowed by law.

  I. Award Plaintiff other damages including prejudgment interest and post judgment interest.

  J. Grant any additional further relief as provided by law, which this Court finds appropriate, equitable, or just.

Respectfully submitted this 18th day of October, 2022.

By: s/ Robin J. Shishido

By: s/ Richard E. Goldsworthy
Robin J. Shishido, WSBA No. 45926
Richard E. Goldsworthy, WSBA No. 40684
Shishido Taren Goldsworthy PLLC
705 Second Avenue, Suite 1500
Seattle, WA 98104
Telephone: (206) 622-1604
Email: rshishido@shishidotaren.com
   rgoldsworthy@shishidotaren.com
Attorneys for Plaintiff

COMPLAINT FOR DAMAGES
Page 15

SHISHIDO TAREN GOLDSWORTHY
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206)622-1604