UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TAHVIO GRATTON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br>a Delaware Corporation,<br><br>Defendant. | NO. 1:22-CV-3149-TOR<br><br>ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT |

BEFORE THE COURT is Plaintiff's Motion for Partial Summary Judgment (ECF No. 52) and Defendant's Motion for Summary Judgment (ECF No. 53). The Court has reviewed the record and files herein, is fully informed, and finds that oral argument is unnecessary to resolve these motions. For the reasons discussed below, Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and Defendant's Motion for Summary Judgment is **GRANTED IN PART**.

//

//

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 1

# BACKGROUND

This case arises out of Plaintiff Tahvio Gratton's charges of racial discrimination against his former employer, Defendant United Parcel Service.

## I.   Plaintiff's Work History

In September 2016, Plaintiff began working for Defendant as a package car cover driver at Defendant's Seattle, Washington distribution center.  ECF No. 54 at 2, ¶ 1.  As a cover driver, Plaintiff's primary responsibility was to cover the shifts of drivers with regular routes who were out for the day.  *Id.* at 3, ¶ 9.  Two years into his tenure at UPS, Plaintiff relocated to Yakima, Washington, and began working at Defendant's facility there.  ECF Nos. 54 at 3, ¶ 4; 52 at 3.  At both locations, the parties' employment relationship was governed by the terms of a National Master Collective Bargaining Agreement (Master CBA) and the Western Supplemental Agreement (Supplement) (collectively, the CBA) negotiated by the International Brotherhood of Teamsters Union (Union).  ECF Nos. 53 at 3; 54 at 2, ¶ 2; 55-1 at 302.  As is pertinent here, the CBA outlines grievance procedures for employees raising workplace issues as well as for processing discharges, suspensions, and terminations.  ECF No. 55-1 at 519-27.

Tensions began to arise between Plaintiff and Defendant shortly after Plaintiff's transfer to the Yakima center.  On April 20, 2018, Plaintiff filed a

grievance with the Union asserting that he had been "laid off"[1] on multiple

occasions without advance notice and in violation of his contractual guarantee to

work a certain number of hours.  ECF No. 68-1 at 9.  Plaintiff argues that he was

frequently laid off in favor of white drivers with less seniority than him.  ECF Nos.

66 at 2; 68-1 at 13.  Defendant, on the other hand, maintains that Plaintiff was laid

off because shifts for cover drivers were assigned based on seniority, and Plaintiff

was more junior due to his recent transfer.  ECF No. 53 at 3-4.  Defendant also

states that it only offered lower-ranked white drivers work over Plaintiff on a

layoff day when Plaintiff failed to respond to Defendant's calls and text messages

asking him to come in.  ECF Nos. 75 at 5-6; 67 at 2; 55-1 at 176.  Plaintiff disputes

that he was unresponsive to Defendant.  *Id.*  Regardless, as a result of the

grievance, Defendant was required to begin posting a regular schedule that notified

drivers of upcoming lay-off days, and Plaintiff received back wages for the hours

he missed.  ECF Nos. 55-1 at 174; 75 at 4.

---

[1] Cover drivers are assigned shifts based on seniority, and may be "laid off"

on days they are otherwise scheduled to work based on the schedules of other

drivers with regularly assigned routes and the volume of packages.  ECF No. 54 at

3, ¶¶ 7-8.

On April 25, 2018, about one week after the filing of the initial grievance, On-Road Supervisor Sam O'Rourke accompanied Plaintiff on a ride-along observation.  ECF No. 54 at 4, ¶ 14; 67 at 3.  Throughout the trip, Mr. O'Rourke repeatedly referred to Plaintiff as "boy," saying things like, "[m]ove faster boy" and "[l]et's get going boy, let's move."  ECF No. 52-2 at 12-13; 32, ¶¶ 12-14.  When Plaintiff greeted a customer he normally talked with as he unloaded his truck, Mr. O'Rourke said, "I didn't tell you to talk, boy."  ECF No. 52-2 at 32, ¶ 12; 33, ¶ 19.  When Plaintiff asked O'Rourke to stop referring to him as boy, Mr. O'Rourke allegedly refused.  ECF No. 52-2 at 43.  Both Plaintiff and a customer who witnessed a portion of this exchange were offended by the racial undertones of O'Rourke's speech.

Plaintiff reported O'Rourke's conduct to Yakima Center Manager Erik Loomis the following morning.  ECF Nos. 68-1 at 15, 69-1 at 3, ¶ 7.  Mr. Loomis appeared unconcerned and simply replied, "That's just the way Sam talks."  ECF No. 69-1 at 3, ¶ 7.  Nevertheless, Mr. Loomis later conceded that Mr. O'Rourke's language could "definitely . . . be perceived" as racist or derogatory, although he did not believe that Mr. O'Rourke intended for it to be taken as such.  ECF Nos. 52-2 at 40; 55-1 at 125.  Mr. Loomis claims that he had an informal discussion with Mr. O'Rourke and counseled him not to use the word "boy" in reference to Plaintiff again.  ECF No. 55-1 at 125-28.

Plaintiff avers that Yakima supervisors retaliated against him after his report to Mr. Loomis.  ECF No. 66 at 3.  Specifically, Plaintiff claims that Mr. Loomis and Plaintiff's direct supervisor, Matthew Fromherz—a friend of Mr. O'Rourke's—began verbally abusing him and denying him work.  *Id.*; ECF No. 68-1 at 145.  In one incident, Plaintiff recounts that he approached Mr. Fromherz regarding a series of recent layoffs and asked why he wasn't being put on schedule despite there being work to do.  ECF No. 68-1 at 17.  In apparent reference to Mr. O'Rourke's earlier "boy" comments, Mr. Fromherz reportedly replied, "Because you didn't come and ask me like a man."  *Id.*  Mr. Fromherz denies that this happened.  ECF No. 5-2 at 120.  Another time, Plaintiff states that he came to work on a day off to collect a package, as he regularly did, and that Mr. Fromherz yelled at him to "[g]et the fuck off the property" after learning he was not there for work purposes.  ECF Nos. 66 at 3; 68-1 at 15.  Mr. Fromherz disputes this occurred as Plaintiff describes, claiming that Plaintiff was interfering with a delivery.  ECF No. 55-1 at 179-80.  Plaintiff reported these incidents to Mr. Loomis, who allegedly failed to take corrective action.  *Id.*  Therefore, in June 2018, Plaintiff grieved these concerns to the Union.  ECF No. 54 at 4-5, ¶¶ 16-17; 55-1 at 68, 216.

Plaintiff alleges that after he filed grievances in June 2018, his supervisors began searching for reasons to fire him.  He provides a record retained by his supervisors of formal discussions they had with him, which documents issues such

as taking a 27- or 29-minute lunch instead of the full 30-minute time allotted and failing to respond to a request to come in on days where he had been previously informed he was laid off.  ECF No. 68-1 at 166-67.  One supervisor, Michelle Reyes, declared that she was present on multiple occasions where Mr. Fromherz and Mr. Loomis discussed their desire to "get rid" of Plaintiff.  ECF No. 68-1 at 4, ¶ 6; *but see id.* at 116-17 (Mr. Loomis averring that it was possible he mentioned it would "be better" if Plaintiff were gone, but that he did not directly express that he wanted to fire Plaintiff).  Another employee, Lisa Irvine, witnessed the same thing. ECF No. 52-2 at 128.  Plaintiff also claims that he was berated for having visible tattoos in violation of the dress code where other white drivers were not.  ECF No. 68-1 at 14, 70.  Mr. Loomis disputes this and says that white employees were corrected on an equal basis for dress code infractions.  ECF No. 73 at 7.

In October 2018, Plaintiff assumed the position of "bid driver," meaning he had a regular daily route that he drove each day and no longer had to cover for others.  ECF No. 52-2 at 23.  However, Plaintiff asserts that he was only able to bid for the "mall route," which was the bulkiest and least desirable route, because Mr. Loomis refused to teach him any other route.  *Id.* at 24.  Plaintiff also claims that, on the one occasion where Mr. Loomis offered Plaintiff the opportunity to learn an alternative open route, Mr. Loomis informed Plaintiff that he would have to learn the route from Mr. O'Rourke.  *Id.* at 23-24.  Plaintiff refused to do another ride-

1   along with Mr. O'Rourke.  *Id.*  Plaintiff believes that Mr. Loomis convinced

2   Brandon Ward, a driver with more seniority than Plaintiff, to bid on the mall route

3   so Plaintiff would not get it, but that Mr. Ward eventually took his name off the list

4   and Plaintiff was awarded the route by default.  ECF Nos. 52-2 at 60; 68-1 at 43-

5   44.  On October 19, 2018, Plaintiff filed a charge of discrimination with the U.S.

6   Equal Employment Opportunity Commission (EEOC), alleging that he had been

7   discriminated against and harassed on the basis of race, and that he had been

8   retaliated against for complaining about such conduct.  ECF No. 52-2 at 62.

9        After acquiring the mall route, Plaintiff alleges that his supervisors conspired

10  to make his job more challenging.  Ms. Reyes purportedly overheard Mr. Loomis

11  and Mr. Fromherz planning to "pile the work on [Plaintiff]" and to add stops to his

12  route that were out of the way.  ECF No. 52-2 at 67, ¶¶ 9-10.  Plaintiff also presses

13  that he was burdened with the worst truck, known among the drivers as the "death

14  truck," which slowed his delivery time.  ECF Nos. 69-1 at 4-5, ¶ 16; 66 at 5.

15       Oppositely, Mr. Fromherz testified at his deposition that extra stops were

16  added to the route, not the individual driver, and that there was no racial motive

17  behind adding stops to Plaintiff's route.  ECF No. 55-1 at 188, 190.  More

18  frequently, Mr. Fromherz stated, other drivers were forced to help Plaintiff because

19  he took longer to complete his route.  *Id.* at 187.

20

Plaintiff states that these issues continued throughout his employment at the Yakima center.  In one grievance dated June 11, 2020, Plaintiff alleged that Mr. Loomis racially discriminated against him because he told Plaintiff that he could only count the number of pre-packed bags (as opposed to individual packages), towards his production quota.  ECF No. 55-1 at 85-86.  Plaintiff reported that a white driver was allowed to count the number of packages instead of the number of bags towards his production quota.  ECF No. 55-1 at 85-86.  Defendant, however, states that it is UPS policy to count the number of pre-packed bags, not individual packages; that the white employee's package count was in fact changed to comply with said policy; and that the white employee did not receive any bonus.  ECF No. 54 at 7-8, ¶¶ 32, 34-35.

Approximately six months later, in January 2021, Plaintiff grieved "[c]ontinuous harassment and retaliation" from Mr. Loomis, stating, "Erik Loomis has gone out of his way to make my job harder than it has to be . . . [by] overloading my route, giving me a worse truck, and instructing supervisors to comply with his malicious efforts to retaliate against me."  ECF No. 55-1 at 97-98. He further added that he was working overtime and that Mr. Loomis was retaliating against him for assuming the position of Union shop steward and helping other black employees file grievances.  *Id.*; *see infra* Background II. (discussing grievances by other black drivers).  In a related grievance filed eight

months later, in September 2021, Plaintiff wrote that management favored certain drivers and that his route was being manipulated to make him appear like a slow driver. *Id.* at 101. Plaintiff also testified that Mr. Loomis frequently withheld his checks and that he had to file grievances for withheld wages. ECF No. 68-1 at 25, 54.

In response to Plaintiff's complaint regarding Mr. Loomis, Karl Leyert, a labor manager for Defendant, began investigating Plaintiff's grievance. ECF Nos. 55-1 at 199; 68-6 at 8-9. Mr. Leyert determined that Mr. Loomis's actions were not the product of racial bias, but instead the result of neutral application of UPS policy. ECF No. 55-1 at 199. For example, regarding Plaintiff's complaint about being assigned the "death truck," Mr. Leyert explained that UPS "switch[es] trucks based off the route and the need of the vehicle," rather than the individual, and that therefore the fact that Plaintiff switched routes meant he had a different truck. *Id.* at 199-200. However, Mr. Leyert admitted that he did not interview Plaintiff or the two references Plaintiff listed on his grievance. *See* 55-1 at 98; 200. In general, Mr. Leyert felt that "there was no merit to a lot of [Plaintiff's] claims." ECF No. 68-6 at 23.

## II. Related Racial Allegations

Other black employees of Defendant reported similar allegations of racial harassment and retaliation by Yakima center supervisors. One employee, Derek

Tamez, testified that another on-road supervisor, Bill Peterson, referred to Plaintiff as "that n***er Tahvio." ECF No. 52-2 at 151. Mr. Peterson also allegedly stated than a different black employee was "stupid and dumb and worthless." ECF No. 52-2 at 152. Mr. Tamez reported the comments to Mr. Loomis, who apparently shrugged it off, saying, "I don't have any control over a lot of things that happen here." *Id.* at 152.

Another black employee, Xavier Briggs, was told at the beginning of his employment that Mr. Loomis wanted him to successfully run his route five times in order to complete his probationary period, whereas new white drivers were not required to complete any test routes. ECF No. 52-2 at 52-3, ¶ 23. Mr. Briggs also declared that white drivers received preferential treatment when it came to routes and workload, and that he and Plaintiff frequently had to help with the misloads of more junior white drivers. *Id.* at 53, ¶¶ 25-31.

Black employees also claimed that they were punished by management for associating with Plaintiff. Mr. Briggs declared that Mr. Loomis approached him and asked "if [he] knew of things that [Plaintiff] was doing wrong." ECF No. 52-2 at 56, ¶ 49. When Mr. Briggs refused to answer, Mr. Loomis allegedly retaliated by loading up Mr. Briggs' route with extra stops. *Id.* at ¶ 51. =

Travis Anderson, a different black employee, also testified that he was retaliated against by Mr. Loomis on account of his race. ECF No. 52-2 at 90, ¶ 4.

Mr. Anderson testified that after he prevailed on a wage grievance, Mr. Loomis approached him and told them that he needed to cut his hair or that his employment would be terminated. *Id.* at 90-91, ¶¶ 7-11. Mr. Anderson, who is Pan African, had always worn his hair long and had never been asked to cut it before. *Id.* at 90, ¶¶ 7-8. Mr. Anderson alleges that a white employee with a similar hairstyle was not asked to cut his hair. *Id.* at 91, ¶ 13. Due to his concerns, Mr. Anderson asked Plaintiff to help him file a religious exemption, which was successful. *Id.*

After prevailing on his exemption, Mr. Anderson declared that Mr. Loomis further retaliated against him by forcing him to cover up his tattoos. *Id.* at 91, ¶ 16. Mr. Anderson felt that he was being singled out on the basis of race because "there were white drivers with all kinds of tattoos showing all the time." *Id.* at 92, ¶ 17. Mr. Anderson likewise testified that he overheard Mr. Loomis telling other drivers to stay away from Plaintiff and that Plaintiff was causing problems. *Id.* at ¶ 19.

### III. Plaintiff's Termination

Plaintiff was dismissed from employment on October 27, 2021 following allegations of sexual harassment alleged to have occurred on October 19, 2021. ECF No. 54 at 11, ¶ 49; 67 at 17, ¶ 50. Plaintiff and Defendant present conflicting accounts of the events leading up to Plaintiff's dismissal.

According to Plaintiff, he tripped walking down the belt in the loading dock area of the Yakima warehouse. ECF No. 68-6 at 124. As he fell, Plaintiff reached

out to steady himself on the back of a nearby pre-load supervisor, Linda Hernandez Cruz. *Id.*  Plaintiff states that he did not realize it was Ms. Hernandez Cruz until he straightened back up, at which point Ms. Hernandez Cruz said, "You touched me inappropriately." *Id.*  Plaintiff clarified that he had only caught himself on her back. *Id.*  Ms. Hernandez Cruz warned, "Don't ever do that again."

Ms. Hernandez Cruz remembers the events of October 19 quite differently. She recollects that she was training another employee in the loading area, and bent over at one point to sort through the packages.  ECF No. 55-1 at 227.  At that point, someone came from behind her and grabbed her lower hip. *Id.*  She stood up, and seeing Plaintiff, asked, "Why are you touching me inappropriate[ly]?" *Id.* Plaintiff mumbled something back which Ms. Hernandez Cruz could not hear, and then said he wasn't touching her inappropriately. *Id.*

Other employees who were present for the incident also offer varying accounts of what happened.  Jose Ramirez Castillo was assisting with loading a truck and saw Ms. Hernandez Cruz bend over to pick up a package.  ECF No. 55-1 at 235-36.  At that point, Mr. Ramirez Castillo saw Plaintiff approach from behind her with his arm extended towards her bottom and watched as Plaintiff grabbed her bottom for a brief moment before Ms. Hernandez Cruz stood up. *Id.* at 235-36. Mr. Ramirez Castillo added that the pathway was clear and that "there was no way [Plaintiff] could have stumbled." *Id.* at 246.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 12

1         In his deposition, Mr. Ramirez Castillo recalled Ms. Hernandez Cruz asking,

2    "What are you doing? That is unacceptable."  ECF No. 55-1 at 236.  Plaintiff

3    allegedly replied, "Oh, I'm sorry.  I'm just kidding," and added something to the

4    effect of "Man, no one can take a joke." *Id.* at 236-37.  In an earlier written

5    statement, Mr. Ramirez Castillo testified that Plaintiff had grabbed Ms. Hernandez

6    Cruz's bottom hip and said he "[couldn't] wait to go one-on-one" with Ms.

7    Hernandez Cruz as he grabbed her.  *Id.* at 244.  During his deposition, however,

8    Mr. Ramirez Castillo testified that he could not recall whether Plaintiff said he

9    wanted to go one-on-one with her or not.  *Id.*  He further clarified that, in writing

10   that Plaintiff had grabbed her "bottom hip," he meant Plaintiff grabbed Ms.

11   Hernandez Cruz's buttocks, not her lower hip.  *Id.*

12        Mr. Tamez also claimed to have witnessed the incident.  ECF No. 55-1 at

13   287.  Mr. Tamez stated that he watched Plaintiff stumble and hold his arms in front

14   of him, bracing himself on the back of Ms. Hernandez Cruz.  *Id.*  Mr. Tamez saw

15   Mr. Gratton hold his arms up as Ms. Hernandez Cruz turned around, but was too

16   far away to hear their conversation.  *Id.*  He wrote, "What I witnessed was most

17   certainly an accident."  *Id.*

18        Ms. Hernandez Cruz reported the contact to Mr. Fromherz the day it

19   occurred.  ECF No. 55-1 at 239.  That same day, Mr. Fromherz collected Mr.

20   Ramirez Castillo from the loading center to verify the incident and take a

1    statement.  *Id.* at 240.  Mr. Fromherz provided Ms. Hernandez Cruz and Mr.

2    Ramirez Castillo with Defendant's EthicsPoint phone number, which both

3    individuals called.  ECF Nos. 55-1 at 230; 68-1 at 154; 68-6 at 89.

4         EthicsPoint referred the matter to security supervisor Ryan Wiedenmeyer for

5    investigation.  ECF No. 55-1 at 269.  Mr. Wiedenmeyer spoke with all involved

6    parties, including Plaintiff and Mr. Fromherz.  *Id.* at 273.  At the time of his

7    interview, Plaintiff did not identify Mr. Tamez as a potential witness.  *Id.* at 280-

8    81; ECF No. 68-6 at 107-108.  Two other unnamed witnesses were also identified

9    after the fact by Mr. Fromherz.  ECF No. 68-6 at 118-19.  Mr. Wiedenmeyer did

10   not have the opportunity to interview these three persons before submitting his

11   report.  *Id.*

12        Based on the information provided by both parties during the investigation,

13   Mr. Wiedenmeyer concluded that "it seemed more that it was a touch versus

14   someone falling into someone" and that there had been some deliberate "unwanted

15   physical contact."  ECF Nos. 55-1 at 274; 68-6 at 110.  However, he determined

16   that the statements which Mr. Ramirez Castillo alleged Plaintiff had made

17   regarding wanting to "go one-on-one" with Ms. Hernandez Cruz were

18   unsubstantiated.  ECF No. 68-6 at 110.  Prior to this incident, Mr. Wiedenmeyer

19   had not investigated a claim at the Yakima center.  ECF No. 55-1 at 272.  Mr.

20   Wiedenmeyer was also unaware of Plaintiff's prior allegations of racial bias.  *Id.* at

1  279.  The parties' statements and Mr. Wiedenmeyer's findings were sent to Mr.

2  Leyert on October 27.  ECF No. 68-6 at 119-20.

3       Mr. Leyert and his supervisor determined that Plaintiff had engaged in

4  unprovoked assault in violation of Article 28, Section 2(a)(5) of the Supplement to

5  the CBA.  ECF No. 55-1 at 206, 211-12.  Article 28 allows for an employee to be

6  discharged without a warning letter for unprovoked assault.  *Id.* at 526.  Per UPS

7  policy, the letter was signed by Mr. Loomis as the center manager, who forwarded

8  it to Plaintiff on October 27.  *Id.* at 210; ECF No. 52-2 at 164.  However,

9  Defendant claims that only Mr. Leyert and his supervisor had the authority to

10 terminate Plaintiff's employment.  ECF No. 53 at 10.

11      Plaintiff filed a grievance that same day, asserting that he was "wrongful[ly]

12 terminat[ed]."  ECF No. 55-1 at 103.  Plaintiff also filed a second grievance that

13 day, stating that he was "falsely accused [of] inappropriate behavior in the

14 workplace."  *Id.* at 105.  Pursuant to Defendant's policy, both a center-level

15 hearing and a panel-level hearing were held, at which Plaintiff defended his

16 innocence, but did not mention whether he believed his termination was on account

17 of racial bias.  ECF Nos. 54 at 12, ¶ 55; 55-1 at 35.  Plaintiff now asserts that the

18 reason for his firing was pretextual and motivated by racial animus.  He argues that

19 this is evidenced by the fact that Mr. Leyert submitted a draft termination letter in

20 the Workday program before Mr. Wiedenmeyer's investigation was complete.

ECF No. 55-1 at 209.  Mr. Leyert, however, testified that he regularly drafted letters in the Workday system before an investigation was complete or the letters were sent out.  *Id.* at 208.  Plaintiff also alleges that Defendant failed to respond allegations of sexual harassment against white male employees similarly.  ECF Nos. 67 at 20; 68-1 at 150-51.

On October 18, 2022, around one year after his termination, Plaintiff filed a lawsuit against Defendant in this Court.  ECF No. 1.  By amended complaint, Plaintiff alleged he was subject to discrimination, a hostile work environment, and retaliation in violation of 42 U.S.C. § 1981, the Washington Law Against Discrimination (WLAD), and Washington's wrongful discharge in violation of public policy tort.  *See* ECF No. 18 at 2, ¶2.

## DISCUSSION

### I.   Summary Judgment Standard

A court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The party moving for summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

1    317, 323 (1986).  The burden then shifts to the non-moving party to identify

2    specific facts showing there is a genuine issue of material fact.  *See Anderson v.*

3    *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla

4    of evidence in support of the plaintiff's position will be insufficient; there must be

5    evidence on which the jury could reasonably find for the plaintiff."  *Id*. at 252.

6        For purposes of summary judgment, a fact is "material" if it might affect the

7    outcome of the suit under the governing law.  *Id.* at 248.  Further, a dispute is

8    "genuine" only where the evidence is such that a reasonable jury could find in

9    favor of the non-moving party.  *Id.*  The court views the facts, and all rational

10   inferences therefrom, in the light most favorable to the non-moving party.  *Scott v.*

11   *Harris*, 550 U.S. 372, 378 (2007).  Summary judgment will thus be granted

12   "against a party who fails to make a showing sufficient to establish the existence of

13   an element essential to that party's case, and on which that party will bear the

14   burden of proof at trial."  *Celotex*, 477 U.S. at 322.

15       On cross-motions for summary judgment "both parties asserting that there

16   are no uncontested issues of material fact[ ] does not vitiate the court's

17   responsibility to determine whether disputed issues of material fact are present."

18   *Fair Housing Council of Riverside Cnty, Inc. v. Riverside Two*, 249 F.3d 1132,

19   1136 (9th Cir. 2001) (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605,

20   606 (9th Cir. 1978)).  Moreover, the court must consider each motion on its own

merits.  *Id.* at 1134 ("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them.").  However, where motions for summary judgment center around the same dispositive issue, a court need not organize its discussion of the cross-motions into separate sections. *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015); *see also, e.g.*, *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 890 (9th Cir. 2019) (determining that where two motions for summary judgment center around the same central legal issue and one party has the same burden of proof under substantive law in both motions, granting one party's motion compels denial of the other party's motion).

## II.    Gateway Issues

The parties move for summary judgment on the statute of limitations, preemption, and waiver and estoppel issues.  Because a decision on each of these matters has the potential to be dispositive of Plaintiff's other claims, the Court addresses them first.[2]

---

[2] As an initial matter, Plaintiff also claims that Defendant's response to his interrogatory asking Defendant to identify the factual bases for its affirmative

### A.    Statute of Limitations

Plaintiff seeks to dismiss Defendant's affirmative defenses of statute of limitations, timeliness, and laches.[3]  ECF No. 52 at 13.  Defendant opposes the motion and brings a cross-motion for summary judgment on the statute of limitations issue.  ECF Nos. 63 at 9; 53 at 11.

Defendant agrees that Plaintiff's claims based on his 2021 termination are timely, but contends that any claim for any event occurring prior to October 18, 2018, is barred by the statute of limitations.  ECF No. 63 at 9.  Therefore,

---

defenses are lacking.  ECF No. 52 at 8-9.  Defendant supplemented its response to this interrogatory on June 30, 2023, with a factual statement of events it believed supported its defenses.  ECF No. 63 at 3.  The Court does not find anything further is required.  Separately, Defendant concedes that its thirteenth affirmative defense (failure to exhaust administrative remedies) should be dismissed.  ECF No. 63 at 13.  The Court accepts Defendant's concession and dismisses the exhaustion defense.

[3]  Defendant did not respond to Plaintiff's argument that its affirmative defense of laches was barred.  *Compare* ECF No. 52 at 13-14 (discussing the defense of laches) *with* ECF No. 63.  Accordingly, the Court dismisses the defense of laches.  *See Bowen v. Oistead*, 125 F.3d 800, 806 (9th Cir. 1997).

1    Defendant argues, Plaintiff cannot base his claims on the following actions: (1) Mr.

2    O'Rourke allegedly referring Plaintiff as "boy" in April 2018; (2) Mr. Fromherz

3    allegedly swearing at Plaintiff in May 2018;  (3) Plaintiff being laid off as a cover

4    driver, which ended when he won the mall route bid on October 10, 2018; and (4)

5    any other alleged comments or actions taken by Mr. Fromherz or Mr. Loomis prior

6    to October 2018.  ECF No. 53 at 11.  Plaintiff responds that his claims accrued

7    during the statutory period and that "[p]atterns of racial hostility, discrimination

8    and retaliation began in 2018 and continued for years, culminating in [his]

9    termination."  ECF No. 70 at 6.  Defendant presses that Plaintiff misapplies the

10   continuing violations doctrine, and that Plaintiff cannot rely on discrete acts

11   predating October 18, 2018 to prove his claims.  ECF No. 73 at 4-5.

12       The statute of limitations for WLAD and related state law tort claims is three

13   years.  *Arthur v. Whitman Cnty.*, 24 F. Supp. 3d 1024, 1028 (E.D. Wash. 2014)

14   (citing *Antonius v. King Cnty.*, 153 Wash.2d 256, 261-62 (2004)); *see also* RCW

15   4.16.080.  The statute of limitations for bringing a claim under Section 1981,

16   respectively, is four years.  *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1003

17   (9th Cir. 2011).  Discrete acts of discrimination and retaliation occurring outside

18   the statute of limitations period may be time barred, even if they relate to acts

19   alleged in timely filed charges.  *Broyles v. Thurston Cnty.*, 147 Wash. App. 409,

20

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 20

432 (2008); *see also Shah v. Cnty. of Los Angeles*, 399 F. App'x 305, 306 (9th Cir. 2010).

However, acts that are otherwise time-barred may be admissible as evidence of a hostile work environment even if they are not independently admissible to support a claim for discrimination or retaliation. *See Diemert v. City of Seattle*, --- F. Supp. 3d ----, 2023 WL 5530009, at *7 (W.D. Wash. Aug. 28, 2023); *see also Broyles*, 147 Wash. App. at 434 ("In sum, a plaintiff with a hostile work environment claim may not use that claim to seek damages for a discrete discriminatory act that is time barred but, if otherwise admissible, may use that discrete act as background information if it tends to support a hostile work environment claim."). A hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see also Story v. Napolitano*, 771 F.Supp.2d 1234, 1246 (9th Cir. 2011) (explaining that the continuing violations doctrine applies to Section 1981 hostile work environment claims "involving related acts that collectively constitute a single unlawful employment practice").

Plaintiff filed suit in this case on October 18, 2022. Therefore, as Defendant notes, discrete acts supporting his discrimination and retaliation claims under WLAD and the tort of wrongful discharge in violation of public policy may only

1    reach as far back as October 18, 2019, due to the three-year statute of limitations

2    period.  Similarly, evidence of any discrete acts supporting Plaintiff's

3    discrimination and retaliation claims under Section 1981 may only reach as far

4    back as October 18, 2018, due to the four-year statute of limitations period.  As

5    such, Plaintiff may not rely on evidence predating October 18, 2018.

6        However, evidence predating October 18, 2018, may be used to support

7    Plaintiff's claim of a hostile work environment.  Defendant contends that the acts

8    prior to October 2018 "involved different actors, are drastically different in nature,

9    and occurred over two years before any timely alleged harassing act."  ECF No. 73

10   at 5.  The Court disagrees.  The acts prior to October 2018 involved the same

11   primary persons—Mr. O'Rourke, Mr. Fromherz, and Mr. Loomis—as those

12   involved after the fact in allegedly assigning Plaintiff to less desirable routes,

13   overloading Plaintiff with work and making his job more difficult, denying

14   Plaintiff his wages and bonuses, and attempting to uncover unfavorable

15   information about Plaintiff from other employees.  Accordingly, the Court will

16   allow Plaintiff to introduce evidence of acts predating October 18, 2018 to support

17   his claim of a hostile work environment.

18   **B.    Preemption**

19       Plaintiff seeks to dismiss the affirmative defense of preemption.  ECF No.

20   52 at 16-17.  Defendant moves for summary judgment on the same issue.  ECF No.

53 at 22-26.

Plaintiff asserts that this Court already rejected Defendant's preemption arguments in ruling on Plaintiff's motion to compel. ECF No. 52 at 16-17. In that Order, the Court wrote:

> Defendant presses that Plaintiff's discovery request is preempted to the extent that it implicates his [WLAD] claim. Specifically, Defendant argues that because the state law claim is dependent upon the meaning of terms contained [within the CBA], it is preempted under § 301 of the Labor Management Relations Act of 1947 (LMRA).
>
> The Court rejects this contention. Plaintiff's complaint alleges unlawful employment practices and unlawful termination for engaging in protected activity under WLAD. "[T]he Ninth Circuit has specifically held that rights established by the WLAD are non-negotiable and separate from a CBA." *Sellar v. Woodland Park Zoological Soc'y*, 2:23-cv-00627-TL, 2023 5425490, at *4 (W.D. Wash. Aug. 23, 2023); *see also McFarland v. BNSF Ry. Co.*, 4:16-cv-5024-EFS, 2016 WL 10515857, at *3 (E.D. Wash. May 5, 2016) (unreported) (wrongful discharge claim from engagement in protected activity is a substantive protection under Washington tort law, separate from any rights provided by the CBA). Accordingly, the Court will not entertain Defendant's argument that Plaintiff's WLAD claim and related motion to compel is preempted or otherwise null.

ECF No. 27 at 8-9.

Defendant responds that this analysis was not dispositive of its preemption arguments because (1) the holding was in the context of a motion to compel and therefore could not have addressed the merits of the defense on a full evidentiary record, and (2) the discovery ruling only referenced preemption under the LMRA,

1    whereas here Defendant also argues that the *Garmon* doctrine divests the Court of

2    jurisdiction.  ECF Nos. 63 at 7-8; 53 at 22-26.

3        Defendant's claim that the earlier LMRA analysis does not control is

4    tenuous because the issue before the Court on the motion to compel was a legal

5    one that could be resolved without further evidence.  However, the outcome would

6    not change even if the Court were to find that its earlier analysis was not

7    dispositive.  Defendant asserts that Plaintiff's claims are preempted because "[t]he

8    essence of his claim . . . is that UPS misapplied the CBA term 'unprovoked

9    assault' by either interpreting this term unfairly or in a discriminatory way, or

10    otherwise breached very specific CBA provisions related to pay, seniority, and

11    routes."  ECF No. 53 at 23-24.  Defendant adds, "[I]t cannot be that UPS complied

12    with the CBA in all regards, as governed by the National Labor Relations Act

13    amended by the LMRA, but acted improperly under a different law."  *Id.* at 24.

14        It stretches the allegations of the amended complaint too far to characterize

15    Plaintiff's claims as mere hairsplitting over the meaning of a CBA-specific term.

16    Plaintiff does not argue that he was fired because Defendant misinterpreted the

17    meaning of "unprovoked assault" under Article 28; instead, he asserts that

18    Defendant manufactured a claim of sexual assault as a pretext for firing him due to

19    racial biases.  At core, Plaintiff's claims are that Defendant unlawfully

20    discriminated against him on the basis of race under WLAD, state tort law, and

Section 1981.  The Court declines to recast those claims into CBA-specific

arguments simply because Plaintiff took advantage of Defendant's grievance

process.  Therefore, Plaintiff's allegations are not preempted by Section 301 of

LMRA.

Defendant's contentions about the *Garmon* doctrine are likewise misplaced.

Defendant says that *Garmon* bars Plaintiff's retaliation claim to the extent that

those claim is based "on filing grievances, the unfair application of the CBA, or

any other labor-related aspect of his employment."  ECF No. 53 at 25.  Defendant

notes that one of Plaintiff's grievances explicitly stated that Plaintiff believed he

was being retaliated against for his role as shop steward of the Union.  ECF No. 63

at 8.  It is true that one sentence mentioned his role as shop steward, but Plaintiff is

not relying on that specific passage to establish his retaliation claim.  Plaintiff's

retaliation claim is instead grounded in the allegation that Defendant racially

discriminated against him, which was also a focal point of multiple grievances.

Accordingly, Defendant's preemption defenses are dismissed.

### C.    Waiver & Estoppel

Plaintiff next moves to dismiss the affirmative defenses of waiver and

estoppel.  ECF No. 52 at 14.  Defendant did not address the issue of waiver;

therefore, the Court dismisses that defense.  *Bowen*, 125 F.3d at 806.

On the issue of estoppel, Defendant argues that Plaintiff is estopped from bringing claims based on the subject matter of a grievance which has formally settled, and that it has resolved many of Plaintiff's pay-related claims internally. ECF No. 63 at 10. Even if Plaintiff's wage-related grievances were resolved, Plaintiff's complaints about compensation are peripheral to his allegations of racial discrimination. In other words, Defendant did not settle Plaintiff's claims of racial bias in the workplace through the grievance process. Accordingly, Plaintiff is not estopped from bringing his claims.

## III. Discrimination Claims

Defendant moves for summary judgment on Plaintiff's WLAD and Section 1981 discrimination claims. ECF No. 53 at 11-17. Defendant argues that Plaintiff's discrimination claims fail because (1) Plaintiff did not establish a *prima facie* case of discrimination; (2) Defendant identified legitimate, nondiscriminatory reasons for each alleged act of discrimination it took; and (3) the evidence does not show pretext. *Id.* The Court agrees and finds that Plaintiff has not established a prima facie case of discrimination.

Section 1981 claims and state law employment discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under the

1    *McDonnell Douglas* framework, the plaintiff bears the initial burden of

2    establishing a prima facie case of discrimination.  *Surrell v. Cal. Water Serv. Co.*,

3    518 F.3d 1097, 1106 (9th Cir. 2008).  If the plaintiff establishes a prima facie case,

4    then the defendant must articulate a non-discriminatory reason for its actions.

5    *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1144 (9th Cir. 2006).  If the defendant

6    satisfies its burden, then the burden shifts back to plaintiff to demonstrate that the

7    reason identified by defendant was mere pretext for discrimination.  *Id.*

8         To stake a successful prima facie case of racial discrimination under Section

9    1981, plaintiffs must show "(1) that they are members of a protected class; (2) that

10   they were qualified for their positions and performing their jobs satisfactorily; (3)

11   that they experienced adverse employment actions; and (4) that 'similarly situated

12   individuals outside their protected class were treated more favorably, or other

13   circumstances surrounding the adverse employment action give rise to an inference

14   of discrimination.'"  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir.

15   2010) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir.

16   2004)).  Similarly, WLAD requires plaintiffs to show that they "(1) belong to a

17   protected class, (2) [were] treated less favorably in the terms or conditions of their

18   employment (3) than a similarly situated, nonprotected employee, and (4) the

19   nonprotected 'comparator' employee does substantially the same work."  *Smith v.*

20   *City of Seattle*, No. 84351-6-I, 2023 WL 8372399, at *5 (Wash. Ct. App. Dec. 4,

1    2023) (citations omitted).  The showing is minimal and does not need to rise to the

2    level of a preponderance of the evidence.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885,

3    889 (9th Cir. 1994).

4         To establish that similarly situated individuals outside the protected class

5    were treated more favorably under the fourth *Hawn* factor, a plaintiff needs to

6    identify a white comparator to whom he was "similarly situated in all material

7    respects."  *Weil*, 922 F.3d at 1004 (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th

8    Cir. 2006)).  Employees are materially similar when they have "similar jobs and

9    display similar conduct."  *Id.* (quoting *Vasquez v. Cnty. of Los Angeles*, 349 F.3d

10   634, 641 (9th Cir. 2003)).

11        Defendant alleges that Plaintiff has not made a successful prima facie

12   showing of discrimination under either Section 1981 or WLAD because Plaintiff

13   failed to identify any similarly situated white employee other than Mike

14   Summerville, whom he alleged was allowed to count individual packages towards

15   his production bonus.  ECF No. 53 at 12.  Relatedly, Defendant claims that

16   Plaintiff has failed to identify a single specific white driver who had their workload

17   reduced while Plaintiff's load was increased or was not disciplined for dress code

18   infractions.  *Id.* at 13.

19        Plaintiff responds that he is not obligated to show that similarly situated

20   white employees were treated more favorably because the test allows him to

1    produce evidence of either similarly situated employees *or* "other circumstances

2    surrounding the adverse employment action [which] give rise to an inference of

3    discrimination." *Hawn*, 615 F.3d at 1156; ECF No. 66 at 21.  He notes that both

4    Mr. Loomis and Mr. Fromherz attempted to deny him work and fire him, and that

5    Mr. Loomis did not take corrective action when Mr. Peterson allegedly referred to

6    him using a racial epithet.  ECF No. 66 at 21.

7            Plaintiff is technically correct that he is not required to submit comparator

8    evidence under *Hawn*.  But while the test does allow Plaintiff to choose between

9    bringing comparator evidence or evidence of other circumstances surrounding the

10   adverse employment action, the Ninth Circuit has explained that a district court

11   may properly focus on the question of comparator evidence when a plaintiff's

12   action "sounds in disparate treatment and seeks to raise an inference of

13   discrimination based solely on circumstantial evidence" and the comparison "is

14   central to plaintiff's case." *Hawn*, 615 F.3d at 1156-57.

15           It is apparent from the face of the amended complaint and supportive

16   pleadings that Plaintiff's case is based on his alleged disparate treatment.  ECF No.

17   66 at 20 (alleging he suffered disparate treatment).  Plaintiff claims that he was

18   denied work opportunities, assignments, and bonuses given to white employees,

19   forced to assist white drivers with their loads, and singled out and written up for

20   minor infractions while white employees were not.  *See* ECF No. 18 at 2, ¶ 2; 66 at

21-22.  Other black employees offered similar testimony.  *See supra* Background

II.

Plaintiff has not offered comparator evidence which would satisfy his

burden to establish a prima facie case of discrimination.  Despite claiming that he

received less favorable treatment than other white employees, Plaintiff did not

identify any specific similarly situated white employees who received more work

than him, were assigned better routes than him, or required his assistance

delivering their misloads.  Plaintiff mentions by name Mr. Summerville, whom he

alleges was given a bonus with respect to his production quota, but Defendant

introduced evidence that Mr. Summerville was also apprehended for his

miscalculation and not compensated on a package-by-package basis.  ECF No. 73

at 7; *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)

("[M]ere allegation and speculation do not create a factual dispute for purposes of

summary judgment.").

Likewise, Plaintiff has not shown to the Court's satisfaction that he was

singled out for dress code or other minor infractions on a more frequent basis than

his white peers: Plaintiff offers his disciplinary log into evidence, but fails to

provide comparable documentation or evidence beyond mere speculation regarding

his supervisors' treatment of white employees who committed similar infractions.

Ms. Reyes declared that Doug Shively and Dennis Forbes were two white drivers

1    who frequently took too long on their routes and were not criticized like Plaintiff.

2    ECF No. 68-1 at 5-6, ¶ 11.  However, the Court lacks information as to the

3    similarity of Plaintiff and these drivers: the record is not clear as to these drivers'

4    routes or seniority, and there is no disciplinary record available which confirms

5    whether or not that they were in fact not scolded by Mr. Loomis or Mr. Fromherz.

6    *See id.* (Ms. Reyes conjecturing that supervisors did not criticize Mr. Shively and

7    Mr. Forbes "as far as *I* know") (emphasis added).

8         Plaintiff also provides the testimony of Mr. Anderson, a black employee

9    who alleges he was asked to cut his hair while Grant Ellsworth—a white employee

10    who also had long hair—was not.  Even if true, this does not show that Defendant

11    discriminated against Plaintiff specifically for his tattoos, nor is there sufficient

12    information in the record to establish that Plaintiff and Mr. Ellsworth were

13    similarly situated.  Therefore, Plaintiff has not proved a prima facie case of

14    discrimination, and summary judgment is granted to Defendant on this issue.

15    **IV.    Hostile Work Environment Claims**

16         Defendant moves for summary judgment on Plaintiff's hostile work

17    environment claims.  ECF No. 53 at 17-18.  To prevail on a hostile work

18    environment claim, Plaintiff must show that (1) he was subjected to verbal or

19    physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the

20    conduct was sufficiently severe or pervasive to alter the conditions of his

employment and create an abusive work environment. *Vasquez*, 349 F.3d at 642.
To resolve a hostile work environment claim, the court will consider all
circumstances, "including the frequency of the allegedly discriminatory conduct,
its severity, and whether it unreasonably interferes with an employee's work
performance." *Surrell*, 518 F.3d at 1109 (citing *Brooks v. City of San Mateo*, 229
F.3d 917, 923 (9th Cir. 2000)).  Generally, "simple teasing, offhand comments, and
isolated incidents (unless extremely serious) will not amount to discriminatory
changes in the 'terms and conditions of employment.'" *Faragher v. Boca Raton*,
524 U.S. 775, 786 (1998).  However, an employer may create a hostile work
environment "by failing to take immediate and corrective action in response to a
coworker's or third party's sexual harassment or racial discrimination the employer
knew or should have known about." *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643,
647 (9th Cir. 2021).

Defendant argues that Plaintiff has not raised a triable issue on his hostile
work environment claim because the allegations of racism he refers to are neither
severe nor pervasive enough.  ECF Nos. 53 at 18-21; 73 at 9-10.  Plaintiff responds
that he only need show whether the conduct was severe "or" pervasive, not both,
and that such questions are better reserved to the trier-of-fact.  ECF No. 66 at 22.

The Court recounts the verbal acts of discrimination which are alleged to
have contributed to a hostile work environment.  In spring 2018, Mr. O'Rourke

1    referred to Plaintiff as "boy" while on a ride-along with him.[4]  Mr. O'Rourke did

2    not stop when Plaintiff asked him to, but did not repeat the remark after his

3    conversation with Mr. Loomis.  Later that spring, Mr. Fromherz, a friend of Mr.

4    O'Rourke's, allegedly told Plaintiff he had not "acted like a man" and yelled at

5    him to leave when he came into the facility on a day off.  When Plaintiff reported

6    this to Mr. Loomis, he failed to take any corrective action.  Similarly, at some

7    undated point in time, another employee reported a different supervisor refer to

8    Plaintiff using a racial epithet and other expletives.  Mr. Loomis again failed to

9    take any corrective action.

10          "The required severity for harassing conduct varies inversely with the

11    pervasiveness or frequency of the conduct."  *Fried*, 18 F.4th at 649 (internal

12    quotations and citations omitted).  Thus, denigrating comments do not create a

13    hostile work environment when made on only one or several occasions several

14    weeks or months apart.  *Id.*  Some examples are illuminating.  In *Swinton*, the

15    Ninth Circuit affirmed a jury finding that the plaintiff's employer had created a

16    hostile work environment.  *Swinton v. Potomac Corp.*, 270 F.3d 794, 799 (9th Cir.

17    2001).  A supervisor within the department "regularly" told racial "jokes" and used

18

19          [4] As mentioned, for his hostile work environment claims, Plaintiff may rely

20    on evidence outside the limitations period.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 33

1    racial slurs in front of the plaintiff and plaintiff's peers.  *Id.*  Plaintiff's co-workers

2    also told racially offensive jokes and referred to plaintiff using racist language.  *Id.*

3    at 799-800.  The Ninth Circuit had little trouble affirming the jury's conclusion

4    that the defendant employer had created a hostile work environment by engaging

5    in a pattern of making racist comments.  *Id.* at 807.  By contrast, in *Vasquez*, the

6    court found the plaintiff had not stated an actionable hostile work environment

7    claim where he only recited a few instances of his supervisors making racial

8    remarks about Hispanics, several months apart, and apparently one supervisor

9    made a negative remark about him in front of youth at the juvenile detention center

10   plaintiff worked at.  349 F.3d at 643.  *See also, e.g.*, *Manatt v. Bank of America,*

11   *NA*, 339 F.3d 792, 795 (9th Cir. 2003) (finding no claim for hostile work

12   environment where plaintiff, who was Asian, observed her coworkers pull their

13   eyes back and refer to her as "China woman" on two separate occasions).

14       For summary judgment purposes, the Court assumes Defendant's

15   supervisors in fact made the abovementioned remarks in reference to Plaintiff.

16   Nonetheless, the Court does not find that Defendant's statements created an

17   actionable claim for a hostile work environment.  While it goes without saying that

18   such comments have no place in a professional setting or any other civilized

19   environment, they were dispersed in time and only occurred on a handful of

20   occasions.  *Compare Lyzer v. Caruso Produce, Inc.*, 3:17-cv-1335-SB, 2019 WL

1   5960655, at *2 (D. Or. Nov. 13, 2019) (declining to grant summary judgment to

2   defendant-employer on hostile work environment claim where plaintiff's white co-

3   workers and supervisors repeatedly called him "boy," referred to him using the n-

4   word, and "joked" that they were going to physically beat him).  Moreover,

5   Plaintiff did not have personal knowledge of Mr. Peterson's comments to Mr.

6   Tamez.  Accordingly, the comments are insufficiently severe or pervasive for

7   Plaintiff to prevail on his hostile work environment claims.

8   **V.      Retaliation Claims**

9          Defendant moves for summary judgment on Plaintiff's WLAD and Section

10  1981 retaliation claims.  A claim for retaliation uses the same *McDonnell Douglas*

11  burden-shifting approach as a claim for discrimination.  *Surrell*, 518 F.3d at 1105.

12  To establish a prima facie case of retaliation, a plaintiff must prove (1) he engaged

13  in a protected activity; (2) he suffered an adverse employment action; and (3) there

14  was a causal connection between the two.  *Id.* at 1108.  "Protected activity includes

15  the filing of a charge or a complaint, or providing testimony regarding an

16  employer's alleged unlawful practices, as well as engaging in other activity

17  intended to 'oppose' an employer's discriminatory practices."  *Raad v. Fairbanks*

18  *N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (quoting 42

19  U.S.C. § 2000e-3(a)), *amended on denial of reh'g*, No. 00-35999, 2003 WL

20  21027351 (9th Cir. May 8, 2003).  Further, "the plaintiff must make some showing

1    sufficient for a reasonable trier of fact to infer that the defendant was aware that the

2    plaintiff had engaged in protected activity." *Id.* (citing *Cohen v. Fred Meyer, Inc.*,

3    686 F.2d 793, 796 (9th Cir. 1982)). A causal connection may be "inferred from

4    circumstantial evidence such as the employer's knowledge of the protected

5    activities and the proximity in time between the protected activity and the adverse

6    action." *Dawson v. Entek Intern.*, 630 F.3d 928, 936 (9th Cir. 2011). An

7    employment action is adverse if it "materially affect[s] [the] compensation, terms,

8    conditions, or privileges of employment," and is "based on retaliatory motive and

9    is reasonably likely to deter the charging party or others from engaging a protected

10   activity." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2002)

11   (internal quotations and citations omitted).

12        The Court finds Plaintiff engaged in the following protected activity within

13   the relevant limitations period:

14        1. Filing an EEOC charge on October 19, 2018;

15        2. Filing a Union grievance on June 11, 2020 regarding Mr.
             Loomis's treatment of Mr. Summerville versus Plaintiff with
16           respect to production quotas;

17        3. Filing a Union grievance on January 20, 2021 regarding alleged
             harassment and retaliation by Mr. Loomis; and
18

19        4. Filing a Union grievance on September 8, 2021 regarding alleged
             favoritism by Yakima center management.

20

1     *See* ECF Nos. 55-2 at 62; 55-1 at 85, 97, 101.[5]

2         Defendant argues that, of these, only the October 19, 2018 EEOC charge and

3 second June 11, 2020 grievance regarding Plaintiff's production quota constitutes

4 protected activity. ECF No. 53 at 20. Specifically, Defendant claims that the other

5 grievances cannot constitute protected activity because they "had nothing to do

6 with race." ECF No. 53 at 20. The Court disagrees. Plaintiff's January 2021

7 grievance alleged that he was subject to "continuous harassment and retaliation

8 from Center Manager Erik Loomis," who had "gone out of his way to make my job

9 harder than it has to be in any event [by] overloading my route, giving me a worse

10 truck, and instructing supervisors to comply with his malicious efforts to retaliate

11 against me." ECF No. 55-1 at 97. In the fact section, Plaintiff wrote:

12        Favoritism – I'm the only bid route driver to whom Erik takes my
       assigned truck away from and time . . . Also my route is constantly
13        overloaded to make routes lighter for the people he likes. Retaliation
       – Being shop steward Erik Loomis retaliates against me because of
14        other drivers grievances.

15

16     [5] Notably, the EEOC document—which was filed within the limitations

17 period—references events *outside* the limitations period. Therefore, while the

18 EEOC document itself may come in as evidence of Plaintiff engaging in protected

19 activity, Plaintiff may not rely upon evidence of the discrete acts mentioned within

20 that document to prove his retaliation and discrimination claims.

1    ECF No. 55-1 at 98 (capitalization and spelling altered for readability).

2    Defendant offers that these statements cannot constitute protected activity

3    because the alleged retaliation was due to Plaintiff's status as a shop steward, not a

4    black man, and because Plaintiff did not explicitly mention Mr. Loomis favored

5    white drivers. ECF Nos. 53 at 20; 54 at 8-9, ¶ 38. This mischaracterizes the

6    background animating these grievances. Plaintiff and others testified he was

7    retaliated against for assisting other black drivers with their grievances, many of

8    which were race-based. *See, e.g.*, ECF No. 52-2 at 52, ¶ 20 ("[Plaintiff] also

9    helped other employees to understand their rights and bring issues forward when

10   needed. In particular, [Plaintiff] was helping to advocate for other black drivers

11   when we weren't being treated fairly."). Moreover, there is room for reasonable

12   debate as to whether Mr. Loomis's alleged "favoritism" of other drivers meant he

13   favored other white drivers, particularly in light of the fact that Plaintiff was

14   alleging "continuous harassment" by Mr. Loomis and that Plaintiff's earlier June

15   11, 2020 complaint alleged that Loomis discriminated against him and had an

16   "overly negative and prejudiced" attitude toward black employees. ECF No. 55-1

17   at 85. Therefore, viewing the facts in the light most favorable to Plaintiff, the

18   January 20 grievance constitutes protected activity.

19   Similarly, Defendant represents that the September 2021 document should

20   be excluded. ECF No. 54 at 8-9, ¶ 38. In that grievance, Plaintiff complained of:

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 38

> Constant favoritism in our center for drivers that management "likes."
> My route has also been constantly manipulated to make me look like a
> slow driver. When I requested my route to be made more efficiently,
> I then was intimidated with a ride along in which that was the only
> day my route was made efficient to accommodate the managers shift
> to be off by 5:30 p.m.

ECF No. 55-1 at 101 (capitalization and spelling altered for readability).

Again, given the broader context of allegations within which this grievance fits, the complaint easily qualifies as protected activity. Therefore, the Court proceeds to consider whether there was some adverse action by Defendant.

Defendant admits that Plaintiff's termination qualifies as a materially adverse action, but argues that Plaintiff cannot raise a genuine issue of material fact to support the inference of causation. ECF No. 53 at 21. First, Defendant argues that there is too wide of a gap between Plaintiff's protected activity and the alleged adverse action. *Id.* However, that argument is foreclosed by the fact that Plaintiff's last grievance was filed in September 2021, approximately one month before his termination.

Next, Defendant argues that Plaintiff cannot raise a triable issue as to whether Mr. Leyert or Mr. Wiedenmeyer had any knowledge of his protected activity so as to establish pretext. ECF No. 53 at 21; *see also Raad*, 323 F.3d at 1197 ("In order to prevail, [plaintiff] must present evidence from which a reasonable trier of fact could conclude that the [officials] who refused to hire her

1   were aware that she engaged in protected activity."). This is refuted by Mr.

2   Leyert's own deposition. Mr. Leyert specifically testified that he reviewed

3   Plaintiff's grievance about favoritism in route/truck assignments. ECF No. 55-1 at

4   199. Moreover, a genuine issue of material fact exists as to Mr. Loomis's

5   involvement in the investigation of the sexual assault claim and Plaintiff's

6   termination. Although Mr. Loomis claimed he was not a part of the firing process,

7   the termination letter was signed by and sent by Mr. Loomis to Plaintiff, and

8   Defendant has not presented any written policy confirming that center managers

9   merely sign off on termination letters as a matter of company practice. Further,

10  Mr. Fromherz, whom Plaintiff reported conflict with, assisted Ms. Hernandez Cruz

11  and Mr. Ramirez Castillo with contacting the EthicsPoint hotline, and the extent of

12  his involvement in Mr. Wiedenmeyer's investigation is unclear.

13      Having concluded that Plaintiff raised a prima facie case of retaliation and

14  that Defendant proffered a legitimate, non-retaliatory reason for Plaintiff's

15  termination—that is, for unprovoked assault under the CBA—the Court also has

16  no difficulty in concluding that Plaintiff has presented sufficient evidence of

17  pretext to avoid the entry of summary judgment for Defendant on this claim. As

18  recounted, multiple different accounts exist of what transpired on October 19,

19  2021, and certain aspects of Mr. Wiedenmeyer's investigation—such as Mr. Leyer

20  drafting a termination letter before the investigation was completed—could lead

1  reasonable minds to differ as to whether Defendant's justification for Plaintiff's

2  separation was pretextual.

3         In sum, enough questions about the credibility of these parties, their

4  knowledge of Plaintiff's protected activities, and the possibility of pretext exist to

5  weigh against granting summary judgment for Defendant on this claim. *See*

6  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating

7  motions for summary judgment in the context of employment discrimination, we

8  have emphasized the importance of zealously guarding an employee's right to a

9  full trial, since discrimination claims are frequently difficult to prove without a full

10 airing of the evidence and an opportunity to evaluate the credibility of the

11 witnesses."). Thus, the Court declines to grant summary judgment to Defendant on

12 Plaintiff's claims for retaliation.

13 **VI.    Wrongful Termination in Violation of Public Policy**

14        Defendant argues that Plaintiff's wrongful termination claim is based on the

15 same set of facts as his discrimination and retaliation claims and therefore must be

16 disposed of. ECF No. 53 at 22. Having found that Plaintiff's retaliation claim

17 survives Defendant's motion for summary judgment, the Court declines to dismiss

18 the wrongful termination claim.

19 **VII.   Other Affirmative Defenses**

20        Plaintiff seeks to dismiss the following defenses pled in Defendant's

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 41

Answer: (1) scope of managerial authority, (2) after-acquired evidence, and (3) mitigation of damages. The Court dismisses the after-acquired evidence and mitigation of damages defenses.

## A.    Scope of Managerial Authority

Plaintiff seeks to dismiss the following defense: "[T]hat any unlawful or wrongful act, if any, taken by any of the officers, directors, supervisors, or employees of Defendant were outside the scope of his/her authority and such acts, if any, were not authorized, ratified or condoned by Defendant, nor did Defendant know nor should it have known of such conduct." ECF No. 7 at 13, ¶ 12.

Defendant points out that this is not truly an affirmative defense as it does not have the burden of proof on this issue, which Plaintiff does not rebut. *See* ECF No. 63 at 16 (citing *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)). Therefore, the Court instead construes the defense as a denial. *See Snap! Mobile, Inc. v. Croghan*, 2019 WL 884177, at *6 (N.D. Cal. Feb. 22, 2019) ("The few authorities to address the subject have held that denials that are improperly pled as defenses should not be stricken.") (citation omitted); *see also Ogden v. Pub. Utility Dist. No. 2 of Grant Cnty.*, 2:12-cv-584-RMP, 2016 WL 589870, at *2 (E.D. Wash. Feb. 11, 2016) (improper categorization as an affirmative defense will not support striking the denial from the Answer). Further, the parties' substantive arguments reveal that a genuine issue of material fact

remains as to this issue.

An "employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)). As discussed *supra*, there is room for reasonable debate as to what extent Mr. Fromherz and Mr. Loomis were involved in Plaintiff's termination and as to whether Plaintiff's working conditions—such as his truck assignment and package route—marked significant changes in his employment status. Accordingly, the Court declines to grant summary judgment to Plaintiff on this issue.

### B.    After-Acquired Evidence

Plaintiff seeks to dismiss Defendant's after-acquired evidence defense. ECF No. 52 at 17-18. Defendant opposes the motion, arguing that after-acquired evidence justifies its termination of Plaintiff. ECF Nos. 63 at 4-5; 14-16. The Court agrees with Plaintiff and dismisses this affirmative defense.

To prevail on an after-acquired evidence, a defendant must show that the plaintiff would have been terminated on an independent basis from the act alleged

1   to have been motivated by discrimination.  *See McKennon v. Nashville Banner*

2   *Publ'g Co.*, 513 U.S. 352, 362 (1995).  When an employer obtains after-acquired

3   evidence of employee wrongdoing through the course of discovery, it must

4   establish that "the employee in fact would have been terminated on those grounds

5   alone if the employer had known of it at the time of discharge."  *Id.* at 362-63; *see*

6   *also O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir.

7   1996) ("An employer can avoid backpay and other remedies by coming forward

8   with after acquired evidence of an employee's misconduct, but only if it can prove

9   by a preponderance of the evidence that it would have fired the employee for that

10  misconduct.").

11      In the course of this lawsuit, Defendant maintains that it also uncovered two

12  independent bases for firing Plaintiff, including (1) that Plaintiff ran a personal

13  barbeque business during work hours in violation of the CBA, and (2) that Plaintiff

14  lied about his employment history on his job application, also in violation of the

15  CBA.  Neither of these rationalizations allow Defendant to stake an after-acquired

16  evidence defense because Defendant had knowledge of both facts prior to

17  Plaintiff's discharge for unprovoked assault.

18      The Court begins with the issue of Plaintiff managing his personal business

19  from work.  The following colloquy, taken from Mr. Fromherz's deposition, makes

20  it apparent that Defendant was quite aware of Plaintiff's self-employment:

Q. [by attorney]:  Did you ever have reason to believe that [Plaintiff] was doing non-work activities during the workday?

A. [by Mr. Fromherz]: Like selling barbeque sauce?

Q.  Possibly.

A.  Yes. Well aware that Tahvio went around on his routes and tried to sell barbeque sauce to everybody on it.

Q.  How do you know that?

A.  There – his cards would be on their desk.  He would give them samples.  He would bring back stuff and ship it while he was still punched in.  There were all kind of different instances like that . . . he, you know, started making barbeque sauce *and made everybody well aware of it*.

Q.  I just want to make sure I understand.  So he would come back to UPS and from UPS mail barbeque sauce?

A.  Mm-hmm.

Q.  While on the clock?

. . .

A.  Yes.

ECF No. 55-1 at 192-93 (emphasis added).

In response, Defendant complains that Mr. Fromherz "did not have the authority to discipline or terminate Plaintiff for selling barbeque products."  ECF No. 64 at 10, ¶ 38; *see also* ECF No. 63 at 5.  But the relevant question is one of knowledge, not authority.  Second, Defendant presses that Mr. Fromherz's

1   knowledge should not be imputed to Defendant.  But Mr. Fromherz explicitly

2   testified that "everybody" was aware of Plaintiff's business and that it was done

3   out in the open.  This, coupled with Plaintiff's testimony that others frequently sold

4   their baked goods at the Yakima center as well, suggests that if there was a CBA

5   policy against selling handmade items while on the job, it was not enforced.  *See*

6   ECF No. 72 at 11.  As such, Defendant has not introduced a genuine issue of fact

7   as to whether it lacked constructive knowledge of Plaintiff's barbeque business.

8        Second, Defendant cannot reasonably claim that it was unaware of

9   Plaintiff's employment history.  As Plaintiff does not dispute, he was terminated

10  from Wheeler Enterprises, the job he held prior to working for UPS, yet indicated

11  that he had never been fired from a previous job on his employment application.

12  ECF No. 54 at 13, ¶¶ 63-64.  Plaintiff also allegedly used a fake name for his

13  supervisor/reference on the application.  *Id.*; ECF No. 75 at 32, ¶ 64.

14       Defendant asserts that it was not aware of these falsities until Plaintiff's

15  deposition.  However, Defendant received an ethics report in October 2016 from

16  an anonymous caller who wanted to make Defendant aware that Plaintiff provided

17  a fake reference on his employment application and that he had been fired from his

18  former job.  ECF No. 52-2 at 176.  The caller also gave the name of then-

19  supervisor of Wheeler Enterprises, Trina Wheeler, and a private investigator whom

20  Ms. Wheeler retained because she believed Plaintiff was stealing money from the

1   company.  *Id.*  Nearly a month after the report was filed, Defendant contacted the

2   caller back to share that the report had been forwarded to management and that

3   "[w]e consider this matter closed."  ECF No. 52-2 at 176.

4           Defendant responds that it was not required to verify this report or "act on

5   anonymous rumors" in order to preserve this defense.  ECF No. 63 at 5-6.  Again,

6   the question is not one of action, but of knowledge.  Therefore, the Court dismisses

7   this defense.

8           **C.   Mitigation of Damages**

9           Plaintiff seeks to dismiss Defendant's mitigation of damages defense.  "As a

10  broad proposition, injured parties are expected to mitigate the damage they suffer."

11  *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 867 (9th Cir. 1980).  To prevail

12  on a defense for failure to mitigate damages, a defendant must establish "that,

13  based on undisputed facts in the record, during the time in question there were

14  substantially equivalent jobs available, which the plaintiff could have obtained,

15  *and* that the plaintiff failed to use reasonable diligence in seeking one."  *Odima v.*

16  *Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (quoting *EEOC v.*

17  *Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994)) (cleaned up) (emphasis in

18  original).  The defendant bears the burden of proving a failure to mitigate damages.

19  *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).

20

1    Plaintiff alleges that Defendant has not produced any evidence proving that

2    substantially equivalent jobs were available.  ECF No. 52 at 11.  For its part,

3    Defendant contends that Plaintiff did not seek any comparable jobs but instead

4    chose to become self-employed, and that numerous issues of fact remain as to

5    whether Plaintiff's mitigation through self-employment was reasonable.  ECF No.

6    63 at 11.  Defendant also says that it has not received Plaintiff's monthly or annual

7    profit or loss forms yet, and that it needs those documents to prove its mitigation

8    defense.  *Id.* at 12, n.3.

9    It appears that Defendant believes it does not need to produce evidence of

10   other substantially equivalent available jobs so long as it can prove that Plaintiff's

11   current self-employment is not substantially equivalent to his work at UPS.  This

12   approach has not been sanctioned by the Ninth Circuit.  To prevail on a mitigation

13   of damages defense, Defendant must provide evidence that substantially equivalent

14   jobs were available to Plaintiff during the time in question which Plaintiff did not

15   endeavor to obtain.  To date, Defendant has submitted no declaration, report, or

16   other material from which a finder of fact could draw the conclusion that other

17   substantially equivalent jobs were available to Plaintiff outside of self-

18   employment.  Although genuine issues of fact can exist as to whether a plaintiff

19   mitigated his damages through self-employment, *see Kloss v. Honeywell, Inc.*, 77

20   Wash. App. 294, 301 (1995), a defendant must nevertheless provide evidence that

1    other substantially equivalent employment existed.  *Compare, e.g.*, *McHugh v.*

2    *Papillon Airways, Inc.*, No. 2:05-cv-00976-RLH-PAL, 2008 WL 182259, at *7 (D.

3    Nev. Jan. 16, 2008) (genuine issue of material fact on mitigation of damages

4    defense where plaintiff was self-employed *and* Defendant submitted data regarding

5    employment rates of equivalent jobs in the area).  Defendant did not do so, and

6    accordingly Defendant cannot prevail on its mitigation of damages defense.

7    **VIII.  Punitive Damages**

8            Defendant argues that Plaintiff cannot recover punitive damages for

9    intentional discrimination or retaliation.  A party may recover punitive damages

10   under Section 1981 "if the complaining party demonstrates that the respondent

11   engaged in a discriminatory practice or discriminatory practices with malice or

12   with reckless indifference to the federally protected rights of an aggrieved

13   individual." 42 U.S.C. § 1981a(b)(1).  "[A]n employer may not be vicariously

14   liable for the discriminatory employment decisions of managerial agents where

15   these decisions are contrary to the employer's good-faith efforts to comply with

16   Title VII." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (citation and

17   internal quotation marks omitted).  However, the limit on liability does not apply

18   "when the corporate officers who engage in illegal conduct are sufficiently senior

19   to be considered proxies for the company." *Passantino v. Johnson & Johnson*

20

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 49

1    *Consumer Prod., Inc.,* 212 F.3d 493, 517 (9th Cir. 2000).

2         Material issues of fact pervade as to what agents had a role in Plaintiff's

3    termination and the seniority of those persons.  As such, the Court declines to enter

4    summary judgment for Defendant on this issue.

5    **CONCLUSION**

6         Plaintiff's claims for discrimination and a hostile work environment are

7    dismissed.  Defendant's affirmative defenses of administrative exhaustion, statute

8    of limitations, laches, preemption, waiver and estoppel, after-acquired evidence,

9    and mitigation of damages are dismissed.

10    **ACCORDINGLY, IT IS HEREBY ORDERED:**

11        1.  Plaintiff's Motion for Partial Summary Judgment (ECF No. 52) is

12           **GRANTED IN PART**.

13        2.  Defendant's Motion for Summary Judgment (ECF No. 53) is

14           **GRANTED IN PART.**

15         The District Court Executive is directed to enter this Order and furnish

16    copies to counsel.  The file remains **OPEN**.

17         DATED April 22, 2024.

18

19    
           THOMAS O. RICE
          United States District Judge

20

ORDER ON MOTIONS FOR SUMMARY JUDGMENT ~ 50