FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 14, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TAHVIO GRATTON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>Defendant. | NO. 1:22-CV-3149-TOR<br><br>ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND GRANTING IN PART PLAINTIFF'S BRIEF IN SUPPORT OF PROPOSED JUDGMENT |

BEFORE THE COURT is Defendant's Renewed Motion for Judgment as a Matter of Law (ECF No. 243), Defendant's Motion for Directed Verdict (ECF No. 230), and Plaintiff's Motion in Support of Proposed Judgment (ECF No. 247). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Defendant's Renewed Motion for Judgment as a Matter of Law (ECF No. 243) is GRANTED, Defendant's Motion for Directed Verdict (ECF No. 230) is DENIED as moot, and Plaintiff's Motion in Support of Proposed Judgment (ECF No. 247) is GRANTED in part.

ORDER ON POST-TRIAL MOTIONS~ 1

# BACKGROUND

This matter arises from a jury verdict awarding $39,600,000 in emotional damages for violations of 42 U.S.C. § 1981, the Washington Law Against Discrimination, and violations of public policy, and $198 million in punitive damages under 42 U.S.C. § 1981a.  Defendant first argued that Plaintiff was not entitled to punitive damages in its Motion for Summary Judgment, stating that no evidence had been presented showing senior managers acted with knowing or reckless intent to violate 42 U.S.C. § 1981.  ECF No. 53 at 26.  In its Order on both parties' motions for summary judgment, the Court reserved for trial the issue of punitive damages, stating, "[m]aterial issues of fact pervade as to what agents had a role in Plaintiff's termination, and the seniority of those persons."  ECF No. 94 at 49.

At trial, Plaintiff presented evidence is support of his 42 U.S.C. § 1981, Washington Law Against Discrimination, and violation of public policy claims. As Defendant only requests judgment as a matter of law with respect to punitive damages, the Court focuses solely on the facts as presented in support of the elements of § 1981a.

## I.    Plaintiff's Background with United Parcel Service

Plaintiff is from Yakima, Washington and began working as a package delivery driver at United Parcel Service ("UPS") at a Seattle center in 2016.  ECF

ORDER ON POST-TRIAL MOTIONS~ 2

No. 225 at 142.  He transferred to the Yakima center in January 2018, and continued his work as a package delivery driver.  *Id*. at 137.  Plaintiff was a member of the Teamsters Union and participated as a shop steward for drivers.  *Id*. at 168, 241.  After his transfer, Plaintiff developed an acrimonious relationship with certain center managers, including Erik Loomis, Yakima Center manager, and Matthew Fromherz, preload manager.  ECF No. 229 at 5, 104.  It was established that Eric Loomis was the center manager during the majority of Plaintiff's employment, but left on medical leave beginning October 21, 2021, and ultimately retired in January 2022.  *Id*. at 76–77.  During his time as center manager, his general job duties included managing approximately 165 to 175 employees and twelve managers, including Matthew Fromhertz, and would conduct tasks such as reviewing daily driver performance reports.  *Id*. at 6, 44–45.  Prior to his managerial role, Loomis had been a shop steward with UPS for ten years.  *Id*. at 77.

Matthew Fromherz was a preload supervisor with thirteen years of experience with UPS.  *Id*. at 104–13.  He was terminated in 2023 for engaging in a relationship with another employee, and action which is against UPS policy.  *Id*. at 94, 116–17.  As specifically related to his employment with UPS, Fromherz discussed his time at the Yakima center, and his general apathy toward union workers because he viewed the protections they received in the workplace as

leading to less efficiency and greater mistakes.  ECF No. 229 at 96.  He expressed a general dislike of Plaintiff as a unionized coworker and found him to be an ineffective driver who would cut corners or cheat the system because he was protected by his union and helped others at UPS do the same.  *Id.*

As presented at trial, Plaintiff viewed the retaliatory behavior as managers in Yakima taking active steps to make his job more difficult than other drivers, including other white drivers.  One example provided by Plaintiff was the expansion of the "mall route," a relatively notorious assignment within the Yakima center, that Plaintiff alleges was continuously expanded while he was assigned to it after he made complaints about harassment and retaliation.  ECF No. 225 at 160. Plaintiff was given this route in part because, as he acknowledged in his transfer form, he had no seniority to bid on routes and thus was left with a less desirable assignment.  *Id.* at 243, 245.  Plaintiff also alleges that he was required to take the unreliable "death truck," away from the mall route, which he represented normally consisted of only an area that was two blocks away from the UPS facility, and out into residential areas.  *Id.* at 160.  However, he also admitted that the standard route for the "mall route" contained ancillary areas that could be assigned stops, which he would have been made aware of when he signed the documentation describing the route he was signing onto.  *Id.* at 245–46.  The truck associated with the mall route was called the "death truck" because it allegedly had a faulty back-

1    up camera, broken fuel gauge, non-functioning heater, and was a manual rather

2    than an automatic transmission.  *Id*. at 175.  And while working the mall route,

3    Plaintiff testified that his requests for assistance with excess packages or stops

4    were denied by center management specifically for him but were not denied for

5    other drivers.  *Id*. at 185–86.

6        He testified that his initial attempts to transition off the mall route and onto a

7    different route were thwarted by management, specifically Loomis, but also

8    admitted that his first opportunity to bid for a new route came in February of 2020

9    and he chose not to take it.  *Id*. at 163, 247.  When Plaintiff did take on a new

10   route, he argues that his stops grew from 150 to 200 over time and was eventually

11   reassigned the "death truck," even though the new route to which he was assigned

12   originally came with a more reliable truck.  *Id*. at 166, 177.

13       Additionally, Plaintiff testified that Loomis refused to permit him to wear

14   specific shoes that aid in his plantar fasciitis, despite holding a doctor's note.  *Id*. at

15   203.  He was similarly denied permission to wear clothing that accommodated his

16   psoriasis, as well as UPS apparel and accessories that were outfitted by his center

17   is Seattle.  *Id*. at 204.  Plaintiff was also called into Loomis's office for the

18   presence of tattoos, despite the presence of tattoos on other drivers.  *Id*. at 205.

19   **II.    Plaintiff's Various Grievances/EEOC Charge and Resolution**

20       Multiple witnesses established that there are several ways to resolve work-

ORDER ON POST-TRIAL MOTIONS~ 5

related issues for all UPS employees: (1) a party may call the anonymous UPS

Help line or visit the online UPS Help website, (2) a party may report directly to a

human resources representative, or (3) a party may report to a supervisor.  ECF

Nos. 220 at 124 and 229 at 215–16.  Witnesses from UPS testified that the

company maintains a strict anti-harassment and retaliation policy, which includes a

prohibition against unprofessional or disrespectful conduct, including unwanted

touching.  ECF No. 229 at 215.  Employees are required to report violations of

UPS's policies, and may access information about the policies and reporting

information on the employee portal.  *Id*. at 220.  The ethics hotline number is also

required to be posted in a well trafficked area in all facilities.  *Id*. at 219.  UPS also

maintains an anti-retaliation policy for employees who do report incidents of

misconduct in the workplace.  *Id*. at 224.

When an employee calls the UPS Help line (also known as the ethics line), a

group of corporate compliance employees decides which UPS team will take on

the investigation of that report.  ECF No. 229 at 217.  Relevant for this lawsuit,

when an unwanted physical contact report is made, the compliance team will

automatically dispatch the Security team, because the safety of the reporting

employee may be at issue.  *Id*.

In addition to the three main ways employees can report workplace disputes,

unionized workers may also report workplace disputes to their union or file a

grievance to specifically seek a resolution for a violation of the union contract.  *Id*. at 216.  Union grievances are not processed by human resources, and instead are processed through the Labor Department in conjunction with the union.  *Id*. Supervisors are not unionized, and therefore do not participate in the grievance process as a claimant to resolve workplace disputes.  ECF No. 220 at 186.

Two Labor Managers, Lashawn Butler and Karl Leyert testified at trial regarding their experiences resolving union grievances related to this matter. Butler has worked for UPS for 34 years and was the Labor Manager for a portion of Washington encompassing the Yakima facility during 2019–2020.  ECF No. 229 at 260.  He then passed the area to Leyert in late 2020 or early 2021.  Butler described the general grievance process, whereby the Labor Department would receive union grievances and investigate the allegations, schedule a center level hearing with the union business agent, and work to settle the matter.  *Id*. at 261. During the pandemic, the time in which Leyert was handling the Yakima facility, the center level meetings were held via Zoom.

During his tenure, Leyert was in charge of approximately seventeen buildings encompassing 3,500 hourly employees and 200 supervisors, handling almost all UPS locations in Washington State.  ECF No. 220 at 111.  Leyert was based in Seattle, Washington and oversaw the Yakima facility from 2021 until he fully retired from UPS in 2023.  *Id*. at 168.  Part of Leyert's job was to process

grievances filed from unionized employees at his assigned UPS facilities, and training other supervisors to familiarize them with the policies and procedures surrounding grievances to ensure that union negotiated terms were followed. *Id*. at 169. Leyert stated that when he received grievances from union employees, his standard practice was to review the complaint and do some fact-finding, including interviewing all non-union witnesses, before setting up a center level hearing. *Id*. at 198.

In relation to his workplace disputes, Plaintiff testified that he was aware of the hotline number but chose to file grievances with his union. ECF No. 225 at 209, 244. With respect to the grievance process, after filing, the union processes the grievance with the Labor Department and sets up a meeting time to discuss the issue. Then, the union representative, the employee if invited by the union representative, any invited witnesses, the labor manager, and anyone else from the labor side would engage in a "center level hearing." ECF Nos. 225 at 250, 229 at 261. At a center level hearing, the parties would discuss the matter and attempt to come to a resolution.

**A. EEOC Complaint**

Beginning in October 2018 until his termination, Plaintiff estimated that he had made four reports relating to workplace harassment and discrimination. ECF No. 225 at 138. Additionally, he filed an Equal Employment Opportunity

ORDER ON POST-TRIAL MOTIONS~ 8

Commission ("EEOC") complaint, lodged on October 19, 2018. *Id*. at 141.  The complaint detailed instances where Plaintiff was laid off or denied working hours in favor of less qualified, non-black drivers, being unfairly reprimanded, and being called "boy" in a racially derogatory manner after his transfer to the Yakima facility. *Id*. at 142.  He alleged that after he made UPS aware of the retaliatory and discriminatory conduct, he was further retaliated against by supervisors. *Id*. at 161–62.  Plaintiff testified that no one at UPS ever spoke with him about or conducted an investigation into the specific incidents alleged, and the complained of manager was ultimately promoted. *Id*. at 144.

### B. Old Navy Pick-Up Grievances

Plaintiff also presented evidence of two internal grievances he filed related to a June 3, 2020, incident in which Erik Loomis required Plaintiff to change his pick-up piece count from 3,200 pieces to 100 bags from and Old Navy pick up. ECF No. 225 at 139, 145–46.  Loomis stated that it was internal policy to count bags rather than individual packages from a business center with many packages, though admitted that Plaintiff was not trained on the practice until after the incident occurred because Yakima does not host many large shippers.  ECF No. 229 at 19.

In one grievance, Plaintiff stated that Loomis wanted to change his pick-up numbers because he did not want to pay him the required bonus for excess packages.  ECF No. 225 at 146.  Additionally, Plaintiff alleged that management at

1   the center used the internal communication to threaten his job while he was still on

2   his delivery route if he did not comply and change the package number from 3,200

3   pieces to 100 bags.  *Id*.  One specific message stated, "Per Erik, instructing you to

4   change the pick-up from Old Navy to a hundred.  If you have issue, call Erik."  *Id*.

5   at 153.  Another read, "You are instructed to put in number of bags picked up from

6   Old Navy, not packages.  Failure to follow instructions can lead to *[sic]* discipline

7   up to and including termination.  Do you Understand? Erik."  *Id*.

8       In another grievance, Plaintiff alleged the requirement to change boxes to

9   bags was discriminatory, as evidenced by his belief that a white driver, Mike

10  Summerville, reported somewhere between 2,000 and 2,500 pieces from the same

11  pick-up location and was not required to change his pickup count.  *Id*. at 139–40.

12      Loomis clarified that Mike Summerville's timecard was similarly corrected,

13  meaning he was also not allowed to count boxes instead of bags.  ECF No. 229 at

14  74.  He admitted that Summerville was not threatened with disciplinary action in

15  the same way but made the caveat that the two incidents were discovered in a

16  different manner.  *Id*. at 20.  He noted that Plaintiff was ultimately not disciplined

17  for the exchange.  *Id.* at 76.

18      Lashawn Butler was the Labor Manager in charge of resolving the bags

19  versus boxes incident.  ECF No. 229 at 283.  During trial, Butler testified that,

20  upon receiving and reviewing the grievances, he contacted operational excellence

1   to learn about the method for drivers when they pick up a large quantity of

2   packages.  ECF No. 235 at 6.  After conferring with operational excellence, Butler

3   determined that Loomis was correct in requiring Plaintiff to change his pick-up

4   from individual pieces to bags.  *Id*.  He determined that Mike Summerville also did

5   not receive a bonus for 2,500 packages picked up from Old Navy.  *Id*. at 10.  He

6   also determined that the messages Plaintiff described as threatening while on the

7   Old Navy pick up were standard progressive discipline used by UPS.  *Id*. at 17.

8          Butler held a center level hearing and could not remember if Plaintiff had

9   elected to attend.  *Id*. at 14.  During the hearing, Butler recounted listening to the

10  union perspective; that drivers were not required to key in bags rather than boxes,

11  that Plaintiff was threatened with a write up, belittled, and that another white driver

12  was not required to change his boxes to bags.  *Id*.  He then counseled parties on the

13  proper method for pick-up, explained how to properly key in bags rather than

14  boxes into the system, and then settled both grievances on August 26, 2020.  *Id*. at

15  15.  Butler stated that had he uncovered discrimination while investigating the Old

16  Navy grievance, he would have involved "HR security."

17         Plaintiff also discussed a UPS complaint against him filed by one of

18  Loomis's employees that worked to support him in a managerial capacity, as

19  Plaintiff told her to "be quiet" during a conversation with Loomis about the

20  package count.  ECF No. 225 at 155.  Plaintiff alleged that her internal complaint

ORDER ON POST-TRIAL MOTIONS~ 11

was handled differently than any grievance he filed, as he was interviewed, and a complete investigation was conducted. *Id*. at 156. Ultimately, no disciplinary action was taken against Plaintiff related to this complaint. *Id*.

## C. Grievances Against Erik Loomis and Matthew Fromherz

In January 2021, Plaintiff filed a grievance related to Loomis, alleging harassment and retaliation because he overloaded the route and that he intentionally gave him an unreliable truck when the route he was driving was typically assigned a different truck. ECF No. 225 at 157. He alleged that Loomis instructed other managers, including Matthew Fromherz, to take actions to make Plaintiff's job more difficult. *Id*. at 158. On September 9, 2021, Plaintiff filed another grievance related to route manipulation, arguing that management was attempting to make him look like a slow driver. ECF No. 225 at 210. He stated that he was being given less desirable routes in favor of drivers that management liked, and that requests to make his routes more efficient were met with a threat to have a supervisor conduct a "ride along." *Id*.

Loomis testified that on some days, Plaintiff would meet his expected time, thereby avoiding a day counted toward a 9.5 violation, and other days he would be over time, thereby making him a "slow driver" for that particular day, but that he never changed his route in order to make him appear slower. ECF No. 229 at 85–86. Loomis stated that he spoke with all drivers who were not meeting their

estimated route time, and he never formally disciplined Plaintiff for the time it took

him to complete his routes.  Further, Loomis detailed the daily routes created by

Orion, UPS's dispatch program, and his experience modifying parameters of those

routes, at times taking the direction of Plaintiff.  He also noted both situations in

which he was unable to make the changes that Plaintiff requested, or when he did

so, and Plaintiff was still unhappy with the route.  *Id.* at 65–66.  Loomis also

discussed the "mall route," and the truck assigned to it, detailing that all drivers are

required to drive manual vehicles and that employees are required to fill out a daily

vehicle inspection report that is reviewed and signed by a mechanic as fit for

service.  *Id.* at 67–68.  Additionally, while Fromherz did not have the ability to

discipline or fire Plaintiff, he could add stops to the route, and agreed that adding

stops or "overloading" a truck out of spite could be a form of retaliation.  ECF No.

229 at 120-21

In his role as Labor Manager, Leyert processed some of the grievances

Plaintiff filed against Erik Loomis, including a grievance he received on February

3, 2021, detailing that Loomis was harassing and retaliating against Plaintiff by

overloading his route and forcing him to drive a subpar truck.  ECF No. 220 at 119.

Leyert stated at trial that he conducted an investigation and determined that, based

on metrics such as stops, pick-ups, and information about the alleged vehicles,

Plaintiff was not being treated differently than other drivers at the center.  *Id.*  At

the center level hearing, Leyert and the union business agent, essentially Plaintiff's

advocate, both agreed that settlement was proper because the claims of retaliation

were unsubstantiated. *Id*. at 205.  Importantly, per the union agreement, a manager

in Leyert's role could not speak to the grievant until the center level hearing, and

thus cannot interview them until the process continues to that point. *Id*. at 204.  It

is up to the business agent of the union to invite the employee to the center level

hearing. *Id*. at 197.  Leyert stated that a center level hearing for this grievance did

occur, but could not remember if Plaintiff attended or what he said if he was

present.

He was also in charge of investigating Plaintiff's September 9, 2021,

grievance regarding favoritism and manipulation of his route against Erik Loomis.

ECF No. 220 at 144.  Leyert engaged in a similar investigation and found no merit

to the allegation at the center level hearing. *Id*. at 207.

**D. Mileage Grievance**

In addition to the four main retaliation and discrimination grievances,

Plaintiff also filed a grievance during the holiday season during an unspecified

year regarding back pay for reimbursable mileage that he was owed after assisting

the Kennewick, Washington center during a particularly heavy delivery season. *Id*.

at 169–70.  That grievance was ultimately heard at the union national level and set

a precedent for mileage reimbursement moving forward.

1    **E. 9.5 Grievances**

2    Additionally, Plaintiff filed, at times weekly, grievances related to UPS's 9.5

3    policy. *Id*. at 198.  An internal union agreement policy allows for employees to

4    place themselves on a list that signals to management that they do not want to work

5    overtime, beyond nine and a half hours, more than twice a week.  ECF No. 229 at

6    262.  If an employee has elected to be on this list and is required to work beyond

7    nine and a half hours on a third day, the employee is entitled to triple wages for the

8    overtime and the action is considered a 9.5 violation.  ECF No. 220 at 200.  An

9    employee that has experienced a 9.5 violation must file a grievance before

10   receiving the overtime payment.  ECF No. 229 at 262.  The grievance is then

11   reviewed by a Labor Manager and approved or denied.  *Id*. at 269.  An additional

12   penalty is assessed if a 9.5 grievance is found, and an employee is not paid within

13   ten days. *Id*. at 279.

14   Both Leyert and Butler testified that most of Plaintiff's grievances were filed

15   during the pandemic, 2020-2021.  ECF Nos. 220 at 201 and 229 at 264.  During

16   the relevant period of time UPS's productivity had increased, perhaps by double,

17   and Leyert estimated he received over 2,000 9.5 grievances as a result.  ECF No.

18   220 at 201.  Plaintiff testified that he was often not provided the overtime pay

19   owed to him within the requisite timeframe and had to file an additional grievance

20   in order to be paid.  ECF No. 225 at 201.  Further, even if Plaintiff prevailed on his

1    wage related grievances, and would therefore be issued a check, he alleged that

2    Loomis would hold these checks, sometimes for up to six weeks.  *Id*.  He then had

3    to file grievances related to those instances as well.  Lashawn Butler was the Labor

4    Manager in charge of some of Plaintiff's 9.5 grievances, including allegations that

5    Loomis was withholding checks.  ECF No. 229 at 278.  He stated that upon

6    receiving the information, he counseled Loomis about providing 9.5 violation

7    checks in a timely manner and required him to provide a write-up explaining the

8    situation.  *Id*.  Ultimately, Plaintiff was paid all overtime wages and related

9    penalties resulting from the 9.5 grievances.  ECF No. 225 at 248.

10    ### III.    Hernandez Incident and Subsequent Investigation

11        The catalyst of this current lawsuit is a UPS internal complaint lodged

12    against Plaintiff for allegedly inappropriately touching another employee, Linda

13    Hernandez.  In Plaintiff's recitation of the events of October 19, 2021, he was

14    walking down a loading dock, tripped over an uneven surface, and reached out to

15    steady himself against Hernandez's back to keep himself from falling, applying

16    "thirty percent," of his body weight against her.  ECF No. 225 at 218.  At the time,

17    Hernandez was in a "mid squat" position according to Plaintiff and was working

18    with a package.  *Id*. at 216.  In Hernandez's versions of events, Plaintiff

19    approached her from behind while she was bent over sorting through packages on

20    the floor and grabbed her hip.  ECF No. 229 at 168, 170.  Both Plaintiff and

Hernandez agree that she turned around and said to Plaintiff something akin to, "You touched me inappropriately."  Plaintiff asserts that he apologized in the moment.

Hernandez stated that she and Jose Castillo, another employee who allegedly witnessed the event, went to Matthew Fromherz, another preload supervisor, to tell him what happened.  ECF No. 229 at 192.  Fromherz then took Hernandez and Castillo to Loomis's office, where Loomis instructed Hernandez to write out a narrative to send to his boss.  *Id.*  Both Hernandez and Castillo reported the incident to the ethics number, as recommended by Fromherz and Loomis.  *Id.* at 188.  Importantly, Linda Hernandez, as a supervisor, is not a union employee, and therefore is not subject to the grievance process.

After contacting the hotline, the investigation was taken over by Ryan Wiedenmeyer, a Security Supervisor, covering an area known as the "south division," encompassing Southwestern Washington.  *Id.* at 22–23.  As part of his position as Security Supervisor, Wiedenmeyer launched investigations into incidents of workplace violence, unwanted physical contact, and issues with dishonesty.  *Id.* at 22.  The role of security investigations at UPS is to gather information, but not to make any final determination.  Wiedenmeyer has since retired, but his office used to be based in Fife Washington.  As a result, Yakima was not a region that he covered during his time with UPS, but he stated he was

filling in for the supervisor of the region encompassing Yakima for this specific investigation. *Id*. at 47–48.

Wiedenmeyer testified in his deposition that he received the complaint on October 22, 2021, from a "Linda" reported through the ethics line. *Id*. at 74. On October 25, 2021, he reached out to Matthew Fromherz, as a preload supervisor, so that interviews with relevant parties could be scheduled, witness statements could be taken, and policy forms could be exchanged. *Id*. at 75. Wiedenmeyer stated that Fromherz said he did not witness the event, and further was unaware that Plaintiff had previously made complaints against Fromherz. Wiedenmeyer next spoke with Linda Hernandez, who, during a telephone call, told him that Plaintiff grabbed her right hip area while she was bent over on the loading dock and said something like "Hey girl." Hernandez told Wiedenmeyer that she felt uncomfortable, angry, disrespected, intimidated, and harassed, but did not necessarily feel assaulted. He asked her to provide a second written witness statement after the interview, and subsequently sent the form to Fromherz for her to fill out. Fromherz testified that he was never consulted about whether Plaintiff should be terminated regarding the Hernandez investigation. ECF No. 229 at 132–33.

On October 26, 2021, Wiedenmeyer interviewed Jose Castillo, who allegedly witnessed the event. ECF No. 222 at 87. Castillo told Wiedenmeyer that

1    he was outside on the belt grabbing packages, and heard Plaintiff say something

2    like "I have got to go one-on-one with you," referring to Hernandez.  ECF No. 221

3    at 92.  Wiedenmeyer had Castillo fill out a witness statement and requested that

4    Fromherz sign it and send it back.  *Id*. at 94.

5         After speaking with Castillo, on October 26 or 27, Wiedenmeyer then

6    contacted Karl Leyert, the UPS Labor Manager, to let him know that he would be

7    reaching out to Lori Olson, the East Division Manager, to set up a meeting with

8    Plaintiff.  *Id*. at 98.  During the conversation, Wiedenmeyer and Leyert discussed

9    that the ten-day window for union member discipline was closing, as the incident

10   took place on October 19.  *Id*. at 101.  In between this conversation and a formal

11   interview with Plaintiff, Leyert and Wiedenmeyer discussed drafting a termination

12   letter, which Wiedenmeyer stated was a contingency pending the outcome of the

13   remaining investigation and determination.  *Id*. at 116–17.

14        Next, Wiedenmeyer interviewed Brandon Ward on October 27.  ECF No.

15   221 at 108.  Ward was referred to Wiedenmeyer through Fromherz as an individual

16   who may have information related to the incident.  *Id*.  Ward was also a UPS

17   supervisor and was conducting a ride along with Plaintiff after the incident.  Ward

18   alleged that Plaintiff stated "nonchalantly" during the ride along that he had put his

19   hand on Hernandez and that she was upset he had touched her.  *Id*. at 111.

20        Also on October 27, 2021, Wiedenmeyer interviewed Plaintiff in the

1    presence of union representative Travis Anderson over Zoom.  ECF No. 221 at

2    122.  Wiedenmeyer stated that Plaintiff told him he tripped, was falling, and

3    reached out to brace himself on Hernandez.  *Id*. at 124.  According to

4    Wiedenmeyer, Plaintiff's retelling of events during the course of the interview

5    changed with respect to hand placement on different parts of Hernandez's body.

6    *Id*. at 126–27.  During the interview, Plaintiff denied making any kind of sexually

7    motivated contact with Hernandez.  *Id*. at 129.

8        Wiedenmeyer did not visit the center in person and additionally conducted

9    all interviews either on the phone or through Zoom.  *Id*. at 50.  At the conclusion of

10    the investigation, Wiedenmeyer made a finding that the claim of unwanted

11    physical contact was substantiated based on the evidence collected, but statements

12    heard by Castillo were unsubstantiated.  *Id*. at 388.  He then turned over all

13    statements and information collected to the Labor group for determination.  *Id*. at

14    453.

15        The final product of the investigation was then reviewed by Karl Leyert.

16    Certain actions under UPS policy, like unprovoked assault and dishonesty, are

17    considered "cardinal sins," and result in immediate termination rather than less

18    formal reprimand and a warning letter.  ECF No. 220 at 146.  In this matter, Leyert

19    was the sole decisionmaker in Plaintiff's termination, and did not consult with

20    anyone else in rendering the decision, including local management.  *Id*. at 170.

1   And he stated that he did not take into account any of the past grievances, nor the

2   EEOC complaint, Plaintiff had filed in rendering the decision. *Id*. at 209. He

3   confirmed that he was in contact with Wiedenmeyer during his investigation, and

4   at one point asked him to confirm that dates in the draft termination letter were

5   correct prior to Wiedenmeyer's interview with Plaintiff. *Id*. at 159. However, he

6   stated that pre-drafting the letter was not a predetermination of the outcome, but

7   rather a practice he has in his role as Labor Manager, as he had previously drafted

8   similar discipline letters in other cases as a contingency. *Id*. at 196–97. He stated

9   that he took the investigation report and five statements he received from

10  Wiedenmeyer, whom he was working with for the first time, and simply did not

11  find Plaintiff's account of the event credible. *Id*. at 171, 172. In reviewing all the

12  accounts of the events, Leyert determined that Plaintiff grabbed Hernandez around

13  her hip area and did not break his fall on her back as he described. In rendering the

14  decision, he considered that Brandon Ward stated that Plaintiff touched Hernandez

15  "to get her attention," rather than to break his fall. *Id*. at 191. Ultimately, Leyert

16  found the action to be the cardinal sin "unprovoked assault," which resulted in

17  immediate termination. *Id*. at 150. The termination letter was ultimately written

18  by Leyert but bore Loomis's signature. *Id*. at 163. Loomis testified that he was

19  not consulted regarding Plaintiff's termination, never recommended that Plaintiff

20  be terminated, and was out on medical leave when the final decision was rendered.

ECF No. 229 at 76.  Leyert explained that it is UPS procedure to have the manager

for the area encompassing the employee sign the termination letter.

At the conclusion of the third day of trial, Defendant again requested the

Court exclude the issue of punitive damages through a Federal Rule of Civil

Procedure 50(a) motion for directed verdict.  ECF No. 230.  Defendant argued that

it was entitled to a dismissal of punitive damages because (1) it offered its own

evidence that the company maintained an anti-harassment policy, (2) Plaintiff

produced no evidence that a manager with decision-making authority acted

contrary to the anti-retaliation policy, and (3) Plaintiff failed to show that Karl

Leyert, in his capacity as Labor Manager for UPS and the sole decision-maker in

terminating Plaintiff, acted with malice or reckless disregard.  *Id.* at 5–9.  Plaintiff

argued that the evidence demonstrated (1) Karl Leyert overrode company policy in

order to take control of the investigation into Plaintiff, making any opportunity for

a proper investigation into the matter impossible, (2) Leyert displayed a reckless

indifference to the retaliation complaints Plaintiff had previously made, (3) at trial,

Leyert conceded that he had failed to investigate Plaintiff's claims, (4) Leyert

failed to take remedial action against Yakima Center manager Eric Loomis, (5)

Leyert failed to investigate allegations that Plaintiff's route was being manipulated,

(6) Leyert acquiesced to Matthew Fromherz, by allowing him to de facto join the

investigation into the allegations against Plaintiff by gathering witness statements

1    at the Yakima Center, and (7) pre-drafting the termination letter was evidence of a

2    pre-determined outcome.  ECF No. 231 at 7–14.  The Court took the Rule 50(a)

3    motion under advisement.  The jury returned a verdict which included punitive

4    damages amounting to $198 million.  ECF No. 236.

5        Defendant now renews its request for judgment as a matter of law in a Rule

6    50(b) motion, arguing that Plaintiff never presented evidence that any decision

7    maker at UPS acted with "malice or reckless indifference."  And that even if

8    individuals involved had acted with malice or reckless indifference, there are no

9    decision makers involved with enough authority to impute action onto UPS as a

10   company, which has made a concerted effort to comply with Title VII.  ECF No.

11   243 at 8–9.  And even if UPS was vicariously liable, the amount awarded in

12   punitive damages is a violation of due process, as the company was never on notice

13   that it would be subject to the amount of punitive damages as awarded by the jury

14   as a penalty for violations.  *Id.* at 9.  Plaintiff argues that any center manager could

15   be considered as a conduit for UPS for the purposes of punitive damages.  ECF No.

16   252 at 22.  But at any rate, he demonstrated that Leyert, as a sufficiently senior

17   manager, ratified and participated in retaliation which resulted in a violation of 42

18   U.S.C. § 1981.  ECF No. 252 at 20–21.

19       Separately, Plaintiff has requested the Court impose equitable remedies that

20   are associated with his 42 U.S.C. § 1981 claim, including: enjoining Defendant

1    "from engaging in such unlawful employment practice"; requiring Defendant to

2    take "such affirmative action as may be appropriate, which may include, but is not

3    limited to, reinstatement or hiring of employees, with or without backpay"; and/or

4    any other relief the Court deems appropriate.  ECF No. 247 at 3.  And requests the

5    Court impose equitable remedies for violation of the Washington Law Against

6    Discrimination: "an order to reinstate persons who have been unfairly terminated,

7    downgraded, or reclassified"; "an order to pay back to a person or persons who

8    would have had a job but for the unfair practice of the respondent"; "an order

9    restoring employment benefits, such as insurance benefits, retirement

10    contributions, sick leave, vacations benefits, seniority standing, lost or not gained

11    because of an unfair practice"; "an order to not retaliate against a complainant,

12    witness, or other person for filing a complaint, testifying, or assisting in any

13    proceeding under RCW 49.60"; "an order to institute affirmative programs,

14    practices, or procedures that will eliminate an unfair practice or its effects, or will

15    prevent the recurrence of the unfair practice"; and/or "an order for any other

16    remedy which is available under comparable civil rights laws of the United States

17    or other states, including the federal Fair Housing Amendments Act of 1988, 42

18    U.S.C. § 3601 et seq." *Id*. at 3–4.  Defendant opposes these requests, arguing that

19    the Court should defer judgment on these issues until all post-trial motions are

20    heard, and additionally should require an evidentiary hearing before implementing

ORDER ON POST-TRIAL MOTIONS~ 24

1    a permanent injunction.  ECF No. 256 at 8.

2                                **DISCUSSION**

3    **I.    Federal Rule of Civil Procedure 50(b) Standard**

4            A motion for judgment as a matter of law under Federal Rule of Civil

5    Procedure 50(b) is not a freestanding action, but rather it is a renewal of a Rule

6    50(a) motion brought during trial before the case is submitted to a jury.  *E.E.O.C.*

7    *v. Go Daddy Software, Inc*., 581 F.3d 951, 961 (9th Cir. 2009) (citations omitted).

8    If a judge denies or defers ruling on a Rule 50(a) motion, and the jury returns a

9    verdict against the moving party, the party may renew the motion on the same pre-

10   deliberation grounds.  *Id*.

11           When considering a renewed motion for judgment as a matter of law under

12   Rule 50(b), the court must draw all inferences in the nonmoving party's favor and

13   is barred from weighing the evidence or making credibility determinations.  *Reeves*

14   *v. Sanderson Plumbing Prods. Inc*., 530 U.S. 133, 150 (2000).  A jury verdict must

15   be upheld if it is supported by substantial evidence.  *Johnson v. Paradise Valley*

16   *Unified Sch. Dist*., 251 F.3d 1222, 1227 (9th Cir. 2001).  "Substantial evidence is

17   evidence adequate to support the jury's conclusion, even if it is also possible to

18   draw a contrary conclusion from the same evidence."  *Id*.  The court must review

19   the entire record in the light most favorable to the non-moving party and must

20   disregard all evidence favorable to the moving party that the jury was not required

to believe. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

Therefore, the question a court should consider under Rule 50(b) is whether

sufficient evidence was presented at trial, such that it supports the verdict rendered,

and not whether the jury could have arrived at a different conclusion. *Reeves*, 530

U.S. at 150; *see also McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir.2000)

("Judgment as a matter of law may be granted only where, so viewed, the evidence

permits only one reasonable conclusion, and that conclusion is contrary to the

jury's verdict.").

Under Rule 50(b), a court may (1) allow judgment on the verdict; (2) order a

new trial; or (3) direct the entry of judgment as a matter of law. Fed. R. Civ. P.

50(b).

> If the court grants a renewed motion for judgment as a matter of law, it
> must also conditionally rule on any motion for a new trial by
> determining whether a new trial should be granted if the judgment is
> later vacated or reversed. The court must state the grounds for
> conditionally granting or denying the motion for a new trial.

Fed. R. Civ. P. 50(c).

## II.    Defendant's Rule 50(b) Motion for Judgment as a Matter of Law pertaining to the 42 U.S.C. § 1981a punitive damages award.

Defendant seeks judgment as a matter of law pertaining to the punitive

damages the jury awarded under 42 U.S.C. § 1981a. The relevant availability of

punitive damages is set forth in 42 U.S.C. § 1981a(b)(1):

1
2
3
4

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

5      The Supreme Court has outlined the scope of available punitive damages to

6  areas in which an employer "discriminate[s] in the face of a perceived risk that its

7  actions will violate federal law." *Kolstad v. American Dental Association*, 527

8  U.S. 526, 535 (1999).  The terms "malice" or "reckless indifference" refer to the

9  employer's knowledge that it may be acting in violation of federal law, not its

10  awareness that it is engaging in discrimination.  *Id*. at 536.  However, it is not

11  enough to show that an employee knew that he or she was engaging in a violation

12  of federal law.  Instead, "an employer may not be vicariously liable for the

13  discriminatory employment decisions of managerial agents where these decisions

14  are contrary to the employer's good faith efforts to comply with Title VII." *Id*. at

15  528; *see also Passantino v. Johnson & Johnson Consumer Prod., Inc*., 212 F.3d

16  493, 516 (9th Cir. 2000) ("Defendants may now establish an affirmative defense to

17  punitive damages liability when they have a bona fide policy against

18  discrimination, regardless of whether or not the prohibited activity engaged in by

19  their managerial employees involved a tangible employment action.").

20      As an initial matter, the Court finds that the only employee with remotely

enough company standing to be contemplated as a proxy for UPS is Karl Leyert.
No other employee who testified or was mentioned at trial, including Erik Loomis
and Matthew Fromherz, had the type of unilateral power such to be considered an
extension of the company, as neither had the power to terminate him.  As discussed
at trial, Plaintiff consistently used one of several channels available to him, the
union grievance process, to address his workplace harassment, discrimination, and
retaliation allegations.  These grievances would ultimately be processed by either
Lashawn Butler or Karl Leyert, but specifically not through Fromherz or Loomis.
*Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001) (holding that the so
called "good faith" defense is not available when the individual employee charged
with reporting harassing conduct fails to do so).  Thus, the question is whether or
not sufficient evidence was presented at trial to suggest that Leyert acted with
malice or reckless indifference to Plaintiff's federally protected rights upon
terminating him.

Plaintiff argues that at trial he demonstrated that Leyert was recklessly
indifferent to his rights beginning when he found no merit to the retaliation and
discrimination grievances filed against Loomis and continuing through his
wrongful termination.  ECF No. 252 at 12.  His intention to fire Plaintiff was
predetermined, Plaintiff argues, as evidenced by the pre-drafted letter and
communication with Ryan Wiedenmeyer.  *Id*. at 16.  Plaintiff believes that Leyert

held some animus toward him for continuing to file grievances and was perhaps furthered influenced by Yakima center management. *Id*. at 14. And even if the Court does not find that Leyert himself had retaliatory intent, Plaintiff argues the Court may imply that Loomis and Fromherz imputed retaliatory intent onto Leyert through a cat's paw theory. *Id*. at 22.

Defendant argues that Leyert had no malicious or recklessly indifferent intent in making the decision to terminate Plaintiff. He drafted the termination letter and consulted with Wiedenmeyer about dates so that the document would be prepared if necessary, and needed to confirm the dates were correct. ECF No. 243 at 11. Further, Defendant argues that Leyert did not consider Plaintiff's past grievances when rendering the decision, and Wiedenmeyer did not even know that Plaintiff had filed past grievances. *Id*.

During trial, Leyert testified that in the instant event, he followed standard procedure when making the decision to terminate Plaintiff. ECF No. 220 at 120–21. He received witness statements and the investigation report, reviewed the information, and made a decision. *Id*. at 172, 176. Wiedenmeyer in turn had never met any of the individuals involved before, and furthermore was not even routinely involved in the geographic area that encompasses Yakima. ECF No. 222 at 214. Leyert did not speak with any of the witnesses or center level managers, including Plaintiff, because his role in this matter was that of final adjudicator. ECF No. 229

at 76 (Erik Loomis testifying he was not consulted regarding whether Plaintiff should be terminated), 229 at 132 (Matthew Fromherz discussing that he was not consulted as to whether Plaintiff should be terminated).  Leyert stated that he did not consider past grievances, and in fact, was not even the Labor Manager in charge of Plaintiff's investigations related to the bags versus boxes incident at Old Navy, the EEOC complaint, or many of the referenced 9.5 grievances.  ECF No. 229 at 208–9.  Further, he requested that Wiedenmeyer review the letter to check the dates, which he stated he had done with other investigators during past investigations to save time in situations where termination is ultimately warranted.  *Id*. at 159, 196–97.  In this particular investigation, because it was not processed as a grievance, Leyert was relying on Wiedenmeyer, a neutral third-party investigator who did not normally cover the Yakima Center and had no prior interaction with any of the center level individuals whatsoever, to gather the information to make a final determination.  *See Poland v. Chertoff,* 494 F.3d 1174, 1183 (9th Cir. 2007) ("Thus, if an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer.").  There was nothing suggestive passed between Leyert and Wiedenmeyer, as was stated above, the pre-drafted termination letter was a contingency in case it was needed in the ten days required to render a decision.  Leyert considered the facts as presented in the investigation report and

ORDER ON POST-TRIAL MOTIONS~ 30

simply did not believe Plaintiff's version of events.  The Court cannot find that, based on the evidence presented at trial, Leyert harbored malicious or reckless indifference to Plaintiff's federally protected rights.

Plaintiff argues that even if the Court does not find that Leyert is ultimately liable for violating his federally protected rights through a personal reckless indifference or malicious intent, it still may find that a "cat's paw" theory permeated the investigation.  ECF No. 252 at 22.  The Ninth Circuit's standard for a cat's paw theory is:

> If a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Poland,* 494 F.3d at 1182.

The standard does not require that an employee actually impute animus onto the decisionmaker, but rather that the employee exert enough influence onto the decisionmaker as to cause the adverse employment action.  *Acosta v. Brain*, 910 F.3d 502, 515 (9th Cir. 2018) (quoting *Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015)).

Though cat's paw was not a theory of liability expressly provided to the jury, Plaintiff argues that he presented a clear theory on which the jury could rely:

Matthew Fromherz and Erik Loomis were influencing Leyert's investigation.  ECF
No. 252 at 22.  Plaintiff argued that Fromherz, whom Plaintiff had reported for
retaliation in the past, inserted himself into the investigation, and ultimately
controlled the outcome, because he directed Hernandez and Castillo to call the
ethics hotline and provided witnesses to Wiedenmeyer.  And similarly, Plaintiff
suggested that Erik Loomis used his managerial capacity to direct Hernandez and
Castillo to contact the ethics hotline.  The Court understands that Plaintiff is
arguing these actions "set in motion," the proceeding, but no evidence was ever
offered that this action was in retaliation for a protected activity, rather than a
function of the reporting process as set forth by UPS, as Hernandez in the moment
turned around and said, "you touched me inappropriately."  *Poland,* 494 F.3d at
1182.

Further, Loomis began medical leave on October 21, 2021, three days into
the investigation and before Wiedenmeyer began reaching out to witnesses.
Fromherz, however, did work with Wiedenmeyer to provide witnesses and witness
statements from individuals at the Yakima Center for the investigation.  Plaintiff's
counsel argued that Fromherz harbored ill will toward Plaintiff, evidenced by the
grievances Plaintiff filed against him that were ultimately unsubstantiated, and thus
sought to influence the outcome of the investigation by "working hand in glove"
with the investigator.  *Id*.  Taking the information given at trial in the light most

favorable to Plaintiff, no testimony or evidence presented suggested that Fromherz interfered with any witnesses, including Plaintiff and any witnesses he wanted to present, giving testimony to Wiedenmeyer.  In fact, Lori Olson, Eastern Division Manager, and not Fromherz, handled the coordination of Plaintiff's interview with Wiedenmeyer, where he was invited to provide additional witnesses.  ECF No. 222 at 99–100.  The witness statement Fromherz provided to Wiedenmeyer was a benign recitation of exactly what happened.  *See Id.* at 61 ("Question: And when you talked to [Matthew Fromherz] it was clear that he actually never witnessed the incident in question; is that correct? Answer: He was not a firsthand witness, if I remember correctly."); *see also* ECF No. 220 at 188 (from Matthew Fromherz witness statement, "When Linda approached me, she told me that she was just sexually harassed by Tavhio. It was very obvious she was frustrated with what happened. I asked what happened. She told me she was . . . bent over. He came up behind her and grabbed her side and that Jose Castillo had witnessed the entire time . . . I told Linda that I need to talk to Jose before he leaves. I will have you both write out a statement . . . and we will go talk to Erik.").

Even still, a "manager's retaliatory motive may be imputed to the company if the manager was involved [in the adverse decision]," *Bergene v. Salt River Project Agricultural Improvement & Power District*, 272 F.3d 1136, 1141 (9th Cir. 2001). Taking the information in the light most favorable to the Plaintiff, even if

1    Fromherz had retaliatory intent toward Plaintiff, was not involved in the ultimate

2    decision to terminate him.  Further, Hernandez stated that she and Castillo reported

3    the incident to Fromherz because he was a supervisor, and that Loomis and

4    Fromherz suggested, but did not require, that they call the ethics hotline.  No action

5    undertaken by Fromherz would indicate that he intended to commandeer the

6    investigation, and Loomis was not present for most of the investigation.  Plaintiff

7    was able to tell his side of the story, was accompanied by union representation

8    during the interview, and was able to provide witnesses if he so chose.  ECF No.

9    222 at 96.  Given the evidence presented at trial, the Court does not find the jury's

10   decision related to punitive damages reasonable, and therefore grants Defendant's

11   Motion for Judgment as a Matter of Law, vacating the jury's award of $198

12   million.  There is no evidentiary basis for such an award.

13        As part of this grant, the Court is required to conditionally rule on a grant of

14   new trial should this finding be overturned on appeal.  Fed. R. Civ. P. 50(c).

15   Should this finding be disrupted on appeal, no new trial is appropriate.  There is

16   simply no basis for punitive damages on the evidence presented.

17   **III.    Plaintiff's Request for Equitable Remedies**

18        Plaintiff argues that he is entitled to select legal and equitable remedies

19   stemming from the favorable jury verdict he received.  ECF No. 247.  Related to

20   the jury verdict with regard to 42 U.S.C. § 1981, Plaintiff requests that the Court

ORDER ON POST-TRIAL MOTIONS~ 34

(1) enjoin Defendant from engaging in unlawful employment practices; (2) order Defendant to reinstate Plaintiff with backpay; and (3) any other remedy the Court deems appropriate.  ECF No. 247 at 3.  Related to the jury's verdict finding a violation of the Washington Law Against Discrimination, Plaintiff requests that the Court (1) order Defendant to reinstate him; (2) require Defendant to issue backpay; (3) require Defendant to restore Plaintiff's benefits such as insurance, retirement benefits, sick leave, vacation, and seniority status; (4) require that Defendant refrain from retaliating against anyone who appeared at trial; (5) require Defendant to implement programs, practices, or procedures that will eliminate an unfair practice or its effects, which includes retraining all supervisors and managers; and (6) require any other remedy which is available under comparable civil rights laws. *Id*. at 4.

To obtain permanent injunctive relief, a plaintiff must have prevailed on the merits, and must also show that: (1) they suffered an irreparable harm; (2) remedies available at law, including money damages, are inadequate to compensate that injury which will be ongoing; (3) the balance of hardships between the parties warrants an injunction; and (4) an injunction is consistent with the public interest.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010).

Beginning with backpay and reinstatement with benefits, Title VII of the

Civil Rights Act of 1964 provides that "the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief the court may deem necessary," making such determination an equitable remedy that a court may award unilaterally.  42 U.S.C. § 2000e-5; *see also Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1012 (9th Cir. 2010) ("Deciding what amount would compensate for the inability to get a job back is not a form of linear fact-finding appropriately left to the jury.  Just as reinstatement invokes equitable factors, so does front pay as a proxy.").

The Washington Law Against Discrimination ("WLAD") states that a plaintiff who is, "injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees or any other appropriate remedy authorized by this chapter or the United States Civil Rights Act of 1964 as amended, or the Federal Fair Housing Amendments Act of 1988."  Wash. Rev. Code § 49.60.030. The Washington State Supreme Court has distinguished the types of remedies available between the WLAD and Title VII, stating that:

> Although RCW 49.60.030(2) also contemplates equitable remedies, such as power to enjoin future violations and to provide for any of the

Title VII remedies, the provision very explicitly allows for recovery of "actual damages" which may be awarded as either a sole remedy or in conjunction with an equitable remedy such as an injunction. And, as previously determined, "actual damages" include full compensatory damages.

*Martini v. Boeing Co*., 137 Wash. 2d 357, 374 (1999) (internal citations omitted).

At issue in *Martini* was whether the jury had been properly instructed as to the issue of back pay and front pay. 137 Wash. 2d at 361 ("The trial court rejected jury instructions proposed by Boeing which would have prevented Martini from recovering back pay (lost wages calculated from the date the employee stopped work until the date of the verdict) or front pay (calculated from the date of the verdict for a reasonably certain period of time that does not exceed the likely duration of employment) as damages for discrimination.").

Damages in this context are shown by measuring the difference between actual earnings for the period and those which would have been earned absent discrimination by the defendant. *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999*) (quoting *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir.1985)). However, a plaintiff bears the burden of proving damage suffered and may be denied when he or she "failed to present testimony regarding the extent of [his or] her damages, whether compensatory or equitable." *Id.* (internal citation omitted). While it is undisputed that Plaintiff was terminated from UPS after the October 19, 2021, incident, he presented no evidence of wage-related damages at

ORDER ON POST-TRIAL MOTIONS~ 37

1    trial and presented no information regarding his financial status until his Reply to

2    his Brief in Support of Proposed Judgment.  ECF No. 261.  Such late filings

3    deprive Defendant the opportunity to respond to the accuracy of the data therein

4    and have been rejected by the Ninth Circuit.  *See Tovar v. U.S. Postal Serv.*, 3 F.3d

5    1271, 1273 n. 3 (9th Cir. 1993) ("[Defendant] moved to strike [plaintiff's] reply

6    brief, arguing that the new information was outside the record and that including it

7    in a reply brief deprived the [defendant] of an opportunity to respond.  To the

8    extent that the brief presents new information, it is improper.").  Therefore, the

9    Court will not impose front or back pay for which Plaintiff did not seek at trial.

10        Similarly, the Court will not require that Plaintiff be reinstated.

11    Reinstatement is improper where the "employer-employee relationship has been so

12    damaged by animosity that reinstatement is impracticable." *Traxler*, 596 F.3d at

13    1012.  Given each party's position regarding the reason for Plaintiff's termination,

14    and Plaintiff's current successful barbecue sauce business (ECF No. 225 at 120),

15    the Court does not find that reinstatement is a remedy equitable to either party.

16    Further, under Washington law, a court may issue a permanent injunction if a

17    plaintiff can show a "well-grounded fear" of the invasion of violated rights.

18    *Washington Fed'n of State Emps., Council 28, AFL-CIO v. State*, 99 Wash. 2d 878,

19    891 (1983).  Because the Court is not ordering reinstatement of Plaintiff, it declines

20    to exercise its discretion to implement retraining of managers and supervisors as

ORDER ON POST-TRIAL MOTIONS~ 38

Plaintiff is not in danger of *his* rights being invaded by UPS again.

Regarding item one under Plaintiff's 42 U.S.C. § 1981 equitable remedies, "Defendant United Parcel Service, Inc. is hereby enjoined from further violations of [42 U.S.C. section 1981 and 2000e-5(g))]," this request is redundant because UPS already has this obligation, and Plaintiff did not bring this lawsuit on behalf of any other UPS employee. *See E.E.O.C. v. Goodyear Aerospace Corp*., 813 F.2d 1539, 1544 (9th Cir. 1987) (remanding a district court's finding on grounds that an instruction to comply with federal law in an *EEOC class action case* may be appropriate). More importantly, the requirement is not narrowly tailored as it would subject Defendant to this Court's enforcement power on a seemingly unlimited basis. *See Roman v. MSL Cap., LLC*, 2019 WL 3017765, at *5 (C.D. Cal. July 9, 2019), *aff'd*, 820 F. App'x 592 (9th Cir. 2020) (" 'Obey the law' injunctions such as this are disfavored, as they are not narrowly tailored and are at odds Federal Rule of Civil Procedure 65(d), which requires that orders granting injunctive relief be 'specific in terms' and 'describe in reasonable detail ... the act or acts sought to be restrained.' "). While the Court agrees with Plaintiff's contention that the at issue statutes are liberally construed and left up to the Court's discretion to find appropriate remedies, a request that Defendant avoid "future violations," is far too broad to be implemented with any consistency or fairness, and thus is denied.

And finally, the Court cannot derive power to implement Plaintiff's item four under the WLAD remedies, injunctive relief from retaliation against witnesses who provided testimony or otherwise assisted with the claim, because WAC 162-08-298 is a provision that applies specifically to administrative law judges.

The Defendant has not challenged, at this time, the jury's verdict for emotional distress.  Therefore, the Court will enter Judgment for that amount.  The Court grants post-judgment interest to run from the day the judgment is entered until payment is made in full, at a rate to be calculated in 28 U.S.C. § 1961.

//

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Renewed Motion for Judgment as a Matter of Law (ECF No. 243) is **GRANTED**.

2. Defendant's Motion for Directed Verdict (ECF No. 230) is **DENIED as moot.**

3. Plaintiff's Brief in Support of Proposed Judgment (ECF No. 247) is **GRANTED in part.**  Defendant is ordered to pay post-judgment interest from the day the judgment is entered according to 28 U.S.C. § 1961, at 4.29% per annum.

4.  The Clerk of Court shall enter Judgment for Plaintiff in the amount of

$39,600,000 against Defendant United Parcel Service, Inc.

The District Court Executive is directed to enter this Order and furnish

copies to counsel.

DATED November 14, 2024.



THOMAS O. RICE
United States District Judge

ORDER ON POST-TRIAL MOTIONS~ 41